[Crim. No. 15473. Fourth Dist., Div. One. Dec. 21, 1984.]

THE PEOPLE, Plaintiff and Respondent, v.
JAMES EARL HARVEY, Defendant and Appellant.

COUNSEL

Handy Horiye, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, John W. Carney and David I. Friedenberg, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**WIENER, Acting P. J.**—James Earl Harvey appeals from a judgment of conviction entered after a jury found him guilty of first degree murder (Pen. Code, §§ 187, 189)[1] and attempted murder (§§ 187, 664), with accompanying firearm use allegations (§ 12022.5) on both counts and a great bodily injury allegation (§ 12022.7) on count two.

FACTUAL AND PROCEDURAL BACKGROUND

Gerald Pierro and Robert Brady were in the United States Navy. Just after midnight on the morning of April 26, 1982, they left the main gate at the 32d Street naval station to go to a friend's house. As they walked northward on the east side of 32d Street, Pierro noticed two black males walking northward on the west side of the street. Between G and F Streets, one of the black males, later identified by Pierro as the defendant James Harvey, began crossing the street toward Pierro and Brady. Pierro noticed that Harvey was carrying a rifle and quickened his pace. He then heard Harvey say, "Freeze." Brady stopped but Pierro continued walking. Harvey repeated the command to "freeze." Pierro then stopped, turned and stepped toward Harvey. As he did so, he heard a shot strike the ground behind him. He glanced over his shoulder to see where the shot had landed and as he turned back to face Harvey, he was shot in the left side. Pierro then turned away from Harvey and began running north on 32d Street to the F Street intersection.

When he reached F Street, Pierro stopped and looked back down 32d Street. He saw Brady at the same position he had stopped initially. Brady

---

[1]All subsequent statutory references are to the Penal Code unless otherwise indicated.

was facing Harvey, who had the rifle pointed at Brady. Harvey had been joined by the second black male. Pierro could hear the three men talking but could not understand what they were saying. Harvey poked Brady in the abdomen with the rifle. Brady then turned and began running up 32d Street toward Pierro. After Brady had taken approximately three steps, Harvey fired several shots. Brady continued running toward Pierro and the two men then ran west on F Street. As he ran, Pierro looked back and saw Harvey and his companion picking something up off the ground at the scene of the shooting.

Brady had been shot once in the back. The two men stopped at an unoccupied house on F Street in a futile attempt to get help. Brady collapsed and later died there. Pierro recovered from his gunshot wound.

Approximately 11 days after the shooting Pierro was shown a photographic lineup which included Harvey's picture. He was unable to identify any of the photographs as the gunman. On the same day as the preliminary hearing, approximately 45 minutes before the hearing was to begin, Pierro viewed a live lineup consisting of 6 individuals including Harvey. Pierro was given a preprinted card for his responses on which he checked a box labeled "I do not identify anyone." He testified that he checked that box because he "wasn't 100 percent sure" but that he believed individual No. 4, who was Harvey, was the man who shot him and Brady. Pierro conveyed this information to the prosecutor and police before the preliminary hearing began. He testified at trial that he was 100 percent certain that defendant Harvey was the gunman.

Ray Donaldson testified under a grant of immunity. He was a friend of Harvey's and admitted to being the second black male walking on 32d Street on the night of the shooting. The particulars of his story, however, differed from Pierro's version. According to Donaldson, he met Harvey outside the Oasis Club on the corner of 32d and Market Streets sometime after midnight on April 26. They saw two white males walking on the east side of 32d Street coming from the direction of the naval station. Without saying anything, Harvey turned and began to follow the sailors on the west side of 32d Street. Donaldson followed some distance behind. Midway between G and F Streets, Harvey crossed the street on a 45-degree angle to intercept the sailors. Donaldson then heard several shots and saw the two sailors running north on 32d Street. Harvey came running back down 32d Street toward Donaldson, carrying something Donaldson said looked "like a long stick."

Clyde Austin, another friend of Harvey's, also testified. He lived in the same apartment with his sister Nancy, her children, and Ray Donaldson,

who was Nancy's boyfriend. Austin stated that Harvey came to his apartment around noon on April 26th with a newspaper which contained a headline relating to the shooting of two sailors on 32d Street. Harvey wanted to make sure that Austin's nieces and nephews did not implicate him in the shooting. Austin admitted having previously told police, about a month and a half after the shooting, that Harvey had claimed to have shot the sailors when he brought the newspaper to Austin's apartment. He explained at trial, however, that he had lied to police in order to protect his sister.

Two .22 caliber shell casings were found by police at the scene of the shooting and a similar casing was found in front of the Donaldson/Austin apartment. Two criminalists positively confirmed that all three casings were fired from the same firearm, a .22 caliber rifle without a stock which was turned over to a defense investigator by the defendant's father, John Harvey, Sr. John Harvey testified that after he learned his son was being investigated in connection with the shooting, he inquired around the neighborhood about the murder weapon, which police had been unable to locate. Shortly thereafter he received an anonymous phone call telling him to look underneath an automobile which was parked in his backyard. When he did, he discovered the stockless rifle wrapped in a plastic trash bag, which he turned over to the investigator.

As to the alleged first degree murder of Robert Brady, the prosecutor pursued two theories at trial. He argued the circumstances of the crime demonstrated premeditation and deliberation. Alternatively, although the underlying felony was not charged, he contended Harvey was attempting to commit a robbery at the time the shooting occurred which would invoke the felony-murder rule. He theorized that the conversation between Brady and the gunman which Pierro could not understand concerned the demand for money. In support of this theory, the trial court admitted into evidence the testimony of Paul Bradley to the effect that Harvey committed an armed robbery less than six months before the 32d Street shooting incident. Bradley testified that he was delivering items to a liquor store at 32d and Webster Streets when Harvey approached him with a pistol and demanded money. After Bradley had given Harvey the money he had in his pocket and as Harvey turned to leave, Bradley heard the pistol discharge and a bullet strike the ground near him. The trial court took judicial notice that Harvey had previously pled guilty to robbing Bradley.

## DISCUSSION

Harvey's principal contention is that the trial court erred in admitting the evidence of his prior robbery of Paul Bradley. He also argues (1) the prosecutor's peremptory exclusion of two black jurors is prima facie evidence

of discrimination and requires explanation; (2) evidence of Harvey's cooperation with the police investigation, consistent with his claim of innocence, was improperly excluded; and (3) the trial court should have given a *sua sponte* instruction that an immunized witness' testimony is to be viewed with distrust. Finally, Harvey asserts he was improperly sentenced to the upper term of nine years on the attempted murder count because the court made dual use of the factors in aggravation.

*Admissibility of the Bradley Robbery*

■ Evidence Code section 1101, subdivision (a) generally prohibits the introduction of evidence of a defendant's past criminal acts to prove that he committed the crime with which he is currently charged. As the Supreme Court explained in *People* v. *Guerrero* (1976) 16 Cal.3d 719, 724 [129 Cal.Rptr. 166, 548 P.2d 366], "The reason for this rule is not that such evidence is never relevant; to the contrary, the evidence is excluded because it has too much probative value. 'The natural and inevitable tendency of the tribunal . . . is to give excessive weight to the vicious record of crime thus exhibited, and either to allow it to bear too strongly on the present charge, or to take the proof of it as justifying a condemnation irrespective of guilt of the present charge.' (1 Wigmore, Evidence (3d ed. 1940) p. 646, quoted in *People* v. *Schader* (1969) 71 Cal.2d 761, 773, fn. 6 . . . .)" Subdivision (b) of section 1101 of the Evidence Code, however, provides a well-worn exception to the general rule by allowing evidence of prior crimes "when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident) other than [the defendant's] disposition to commit such acts." In the present case, the People argue that evidence of the Bradley robbery was relevant to the issues of the *identity* of the 32d Street gunman and, once his identity was established, Harvey's *intent* to rob Brady prior to shooting him.

Both Harvey and the People agree that the admissibility of prior crimes evidence to prove identity and intent is governed by discussions in a series of Supreme Court cases. (See *People* v. *Thompson* (1980) 27 Cal.3d 303 [165 Cal.Rptr. 289, 611 P.2d 883]; *People* v. *Guerrero, supra,* 16 Cal.3d 719; *People* v. *Thornton* (1974) 11 Cal.3d 738 [114 Cal.Rptr. 467, 523 P.2d 267], disapproved on other grounds in *People* v. *Flannel* (1979) 25 Cal.3d 668, 684, fn. 12 [160 Cal.Rptr. 84, 603 P.2d 1]; *People* v. *Haston* (1968) 69 Cal.2d 233 [70 Cal.Rptr. 419, 444, P.2d 91].) ■ They also agree that the admissibility of the Bradley robbery to show that Harvey was the 32d Street gunman—the identity issue—depends on comparing the similarities and differences between the two crimes. (See *People* v. *Haston, supra,* 69 Cal.2d at pp. 245-246.) ■ When evidence that defendant committed a prior crime is admitted to show that defendant also committed

the crime with which he is currently charged, a line-drawing question is presented. The evidence is not admissible unless the circumstantial similarities between the two crimes create a sufficiently strong inference that the perpetrator of the prior crime is the perpetrator of the currently charged crime. (See *People v. Thornton, supra,* 11 Cal.3d at p. 756.) We also recognize that the particular similarities between the crimes—referred to by the Supreme Court in *Thornton* as "shared marks"—need not be signatorally distinctive. "[F]eatures of substantial but lesser distinctiveness, although insufficient to raise the inference if considered separately, may yield a distinctive combination if considered together."[2] (*People v. Haston, supra,* 69 Cal.2d at p. 246.) We draw from this the principle that as the number of shared marks decreases, their distinctiveness must increase in order for the evidence to be admissible.

Turning to the facts of this case, the People identify the following similarities between the Bradley robbery and the 32d Street shooting: (1) the crimes occurred in the same area of the city (same street, eight blocks apart); (2) a firearm was used; (3) the firearm was discharged into the ground at some point during the crimes; (4) the victims were young white males in a predominantly black neighborhood; and (5) the perpetrator fled on foot from the scene of the crime. They argue that these five "shared marks" give rise to an inference that the man who robbed Paul Bradley was the same man who shot Gerald Pierro and Robert Brady. It is an argument we cannot accept.

Although we recognize that "distinctiveness" is undoubtedly a spectrum along which various "shared marks" fall in imperceptible gradations, it is helpful for the purposes of discussion to speak of three rough categories. At one extreme are marks from which no inference can be drawn, marks which "are of such common occurrence that they are shared not only by the charged crime and defendant's prior offenses, but also by numerous other crimes committed by persons other than defendant." (*People v. Haston, supra,* 69 Cal.2d at p. 245.) At the other extreme are marks "'so unusual and distinctive as to be like a signature.'" (*Id.,* at p. 246, fn. 14, quoting McCormick, Evidence (1954) § 157, p. 328 (italics omitted); see also *People v. Alvarez, supra,* 44 Cal.App.3d at p. 383.) Very few of such

---

[2]The "distinctive combination" situation has also been discussed in terms of establishing the defendant's modus operandi. (See, e.g., *People v. Haston, supra,* 69 Cal.2d at p. 245.) The chain of inferences proceeds as follows: The circumstances of the prior crime establish the manner in which defendant commits such crimes; the current crime was committed in the same manner as the prior crime; therefore, the defendant committed the current crime. Where such an inferential pattern is attempted, it is necessary not only to compare the number and distinctiveness of the similarities between the two crimes but also the number and distinctiveness of the dissimilarities. (See *People v. Haston, supra,* 69 Cal.2d at p. 249, fn. 18; see also *People v. Alvarez* (1975) 44 Cal.App.3d 375, 386 [118 Cal.Rptr. 602].)

marks—perhaps even one if sufficiently unique—would be enough to allow the identity inference to be drawn. A third category lying between the two extremes consists of those "features of substantial but lesser distinctiveness [which] . . . may yield a distinctive combination if considered together." (*People* v. *Haston, supra,* 69 Cal.2d at p. 246.)

Of the five "shared marks" identified by the People, none come close to being so unique as to constitute the criminal's "signature." Several, in fact, are so indistinctive as to be of virtually no probative effect at all. (*Id.,* at p. 246, fn. 15.) Tragically the occurrence of the two crimes in the same part of the city within a six-month period borders on the irrelevant. Absent a factual record, it is speculative to assume that the occurrence of the two crimes in the same area of town makes them unique. As to the use of a gun, it is a sad fact of modern American life that firearms are so accessible as to be the number one instrumentality of violent crime in this country. (See generally, e.g., Cook, *The Effect of Gun Availability on Violent Crime Patterns* (1981) 455 Annals 63; Shields, Guns Don't Die—People Do (1981) pp. 28-29, 172-174.) Finally, while the fact that both perpetrators fled on foot distinguishes the crimes from ones in which vehicles were used, an escape on foot is hardly unusual among criminals.

The two "shared marks" which show some distinctiveness are numbers (3) and (4). While the similarity in the race and age of the victims is minimally noteworthy, what appears to be distinctive is the presence of whites in a predominantly black neighborhood. There is nothing in the record to suggest that it is unusual for the victims of crime to be of a different racial background from the perpetrators.

Perhaps the most distinctive "shared mark" is the discharge of the firearm into the ground during the commission of the crime, but it is clearly of insufficient distinctiveness to warrant the inference that the perpetrator of the Bradley robbery was the 32d Street gunman. In particular, the dissimilarities between the firearm discharges in the two incidents dilute any persuasive force the facial similarity might initially appear to suggest. The gun used in each case was an entirely different type and size. In the Bradley robbery, the gun was discharged after the robbery was completed as Harvey was turning to leave. In the present case, the gun was fired as the gunman first approached the victims, apparently as a warning to Pierro to "freeze."

Furthermore, the dissimilarities between the two crimes are numerous. The Bradley robbery occurred during the daytime. Harvey acted alone. The victim was a deliveryman who had just been paid. The scene was a liquor store at which defendant used to work, which suggested he planned the

timing to maximize the amount taken. The 32d Street shooting took place in the middle of the night. The gunman had an accomplice. The fact that Brady and Pierro were walking on 32d Street was mere happenstance.[3] Perhaps most importantly, the 32d Street gunman showed a much greater inclination to use violence than did Harvey in the Bradley robbery.[4] These numerous dissimilarities support our conclusion that whatever similarities exist between the two crimes do not "yield a distinctive combination." (*People* v. *Haston, supra,* 69 Cal.2d at p. 246.)

In summary, there is virtually nothing to distinguish these two crimes from numerous street crimes which, regrettably, occur in major metropolitan areas every day. The fact that Harvey committed the Bradley robbery gives rise to no inference that he was the 32d Street gunman.[5]

 The People argue, however, that even if evidence of the Bradley robbery was inadmissible to prove identity, it is nonetheless admissible to show that if Harvey committed the 32d Street shooting, he did so while intending to rob Brady.[6] This would make Brady's killing a first degree murder by operation of the first degree felony-murder rule irrespective of whether the killing was premeditated. In making this argument, the People rely on language in *People* v. *Thompson, supra,* 27 Cal.3d at page 319 which recognized that where evidence of a prior crime is introduced to prove intent, as opposed to identity, it is not always necessary to show that the prior and current crimes were substantially similar. The People impliedly suggest that substantial similarity is unnecessary here for evidence of the Bradley robbery to be admissible to show that Harvey intended to rob Brady.

 The *Thompson* opinion makes clear that the limited exception it recognized is simply inapplicable to the facts of the present case. We quote at some length because *Thompson*'s discussion, especially its citation to *People* v. *Guerrero, supra,* 16 Cal.3d 719 is directly on point.

"It has been assumed on occasion that a showing of substantial similarity is not required if intent is the material fact sought to be proved by the

---

[3]Pierro testified that he and Brady were supposed to work that night but had their shift cancelled at the last minute.

[4]Pierro was shot before any money was demanded or other motive demonstrated.

[5]We have here concluded that no inference of identity can be drawn. We note that in *Haston,* the Supreme Court cautioned that even where a weak inference may be drawn, "the court's discretion should be exercised in favor of exclusion" because of the "manifest" potential for prejudice. (69 Cal.2d at p. 247; *People* v. *Thornton, supra,* 11 Cal.3d at p. 756.)

[6]There was, however, no limiting instruction to this effect.

introduction of the evidence of an uncharged offense. This assumption is too broad. It is correct only when the similarity of offenses is irrelevant to the chain of inference sought to be drawn between the uncharged offense and the fact of intent in the charged offense.

"*People* v. *Durham, supra,* 70 Cal.2d 171 [74 Cal.Rptr. 262, 449 P.2d 198], was such a case. The defendant was accused of killing a police officer who had made a traffic stop on the car defendant was driving. This court ruled that several prior dissimilar crimes were admissible to prove intent to kill, premeditation, and deliberation by establishing the intermediate fact of motive. Similarity of offenses was not necessary to establish this theory of relevance, since it was the *fact* of the commission of the uncharged crimes— not their similarity to the charged offense—which gave rise to the reasonable inference that defendant had a motive to kill the officer.

"However, similarity is often necessary to bridge the gap between other crimes evidence and the material fact sought to be proved. Thus, in *People* v. *Guerrero, supra,* 16 Cal.3d 719, a defendant was accused of the murder of a 17-year-old girl by means of a blunt object. The victim had been found with her blouse pulled up but there was no evidence of sexual molestation. The prosecution was allowed at trial to introduce evidence that defendant had recently raped another 17-year-old girl and had thereafter threatened her with a lug wrench. This evidence was admitted to establish, inter alia, that in the charged offense defendant had intended to rape the victim, thus invoking the felony-murder rule.

"This court unanimously ruled the evidence was inadmissible to prove intent since the prosecution had 'not shown that the similarities between the two offenses are substantial enough to have probative value.' (16 Cal.3d at p. 728.) Significantly, the court relied upon the rationale of *People* v. *Haston* (1968) 69 Cal.2d 233 [70 Cal.Rptr. 419, 444 P.2d 91]. *Haston* is the leading case for the well established rule that there must be distinctive common marks between an uncharged and charged crime to prove identity on the basis of a common modus operandi." (*Thompson, supra,* 27 Cal.3d at pp. 319-320, fn. 23.)

 It is clear that the present case is a *Guerrero* rather than *Durham* type of situation. Here and in *Guerrero,* the prosecutor attempted to show defendant's intent in the current crime by proof of his similar intent in a prior crime. In *Durham,* the defendant's *intent* in the prior crimes was irrelevant; it was the *fact* of his commission of the prior crimes which gave him a motive to commit the charged crime. Where evidence of defendant's intent in a prior criminal episode is introduced to prove that he harbored a similar intent in the currently charged crime, the desired inference is only as strong as the crimes are similar. (*People* v. *Thompson, supra,* 27 Cal.3d

at pp. 319-320, fn. 23; *People* v. *Guerrero, supra,* 16 Cal.3d at pp. 728-729.) We have already indicated that the circumstances of the two crimes are far from sufficiently similar to allow an inference that the same person committed both. We likewise conclude it was error to admit the evidence of the Bradley robbery to prove Harvey's intent to rob.

■ It remains to be determined whether the error was prejudicial. The presence of the felony-murder theory of first degree murder considerably complicates our task.

On the question of identity, we are unable to say that the admission of evidence of the Bradley robbery prejudiced Harvey. Both Pierro and Donaldson positively identified Harvey as the gunman. We are aware that both witnesses, particularly Donaldson, were impeached: Pierro with evidence which cast doubt on the accuracy of his identification; Donaldson with evidence of his involvement in the incident, prior false statements and his immunity deal. Nonetheless, their identification of Harvey was supported by Austin's testimony regarding Harvey's concerns that Austin's nieces and nephews would implicate him and by Austin's prior statement that Harvey had admitted shooting the sailors. It is not reasonably probable that absent evidence of the Bradley robbery, the jury would have reached a conclusion other than that Harvey committed the shootings. (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

■ Whether the error was prejudicial on the issue of intent is another question entirely. The issue of Harvey's intent to rob has a very narrow focus, being limited to the felony-murder theory on the first degree murder charge. Were felony murder the only theory of first degree murder to have been presented to the jury, reversal of that conviction would be mandated. Absent the testimony regarding the Bradley robbery, there is simply no substantial evidence on this record which would warrant a jury's finding Harvey guilty of attempted robbery beyond a reasonable doubt.[7] (See *People* v. *Johnson* (1980) 26 Cal.3d 557, 576 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255].)

The jury, however, was not only instructed on first degree felony murder; standard premeditated first degree murder instructions were also given. The People suggest that any error in admitting the Bradley robbery evidence to

---

[7]We recognize that Harvey may in fact have approached Pierro and Brady intending to rob them. His conversation with Brady, if we knew its contents, might explain his motive. But robbery is only one of several arguable explanations for Harvey's conduct. Others include racial harassment or animosity toward sailors. Substantial evidence means more than simply one of several plausible explanations for an ambiguous event. Something additional was required to permit the jury to find Harvey guilty of attempted robbery.

prove felony murder was not prejudicial, because the jury in all likelihood found that Harvey premeditated the killing of Robert Brady. A reading of the prosecutor's closing argument, however, makes it difficult to accept the suggestion. While the premeditated murder theory was explained, the prosecutor continually discussed even that theory in the context of a robbery: "Obviously, there is nothing here showing that there is any evidence that the defendant was precluded from taking the time to deliberate and meditate the crime. Indeed, leaving no witnesses to the crime makes a lot of sense to the tortured reasoning of a robber. Leaving a witness to the Paul Bradley robbery caused the defendant a great deal of problems, didn't it. It is certainly reasonable that the defendant decided not to leave any witnesses to this robbery that night." Moreover, the felony-murder theory was clearly emphasized and the prosecutor repeatedly relied on the probative effect of the Bradley robbery: "This is why the evidence of the robbery of Paul Bradley is so important. You know that this defendant under similar circumstances has formed the intent to commit robbery. You know and the court took judicial notice earlier and made reference to it that on May the 5th the defendant admitted his guilt of robbery of Paul Bradley. . . . So you know that the defendant has under similar circumstances committed an actual robbery. You must now determine what was his intent at the time he approached Brady and Pierro, and I submit the evidence is overwhelming that his actual intent was to commit robbery."

Finally and significantly, the prosecutor's summation did not even mention the premeditation theory: "There is nothing complicated, ladies and gentlemen, about the commission of these horrible crimes. The motive was plain and simple, a street robbery. This defendant had done it before. He was going to do it again. You don't have to guess whether the defendant intended to pull a stickup on 32nd Street. You have evidence that the defendant has pulled a stickup on 32nd Street, and you have considerable evidence that he planned to do it again, that he did try to do it again."

Under the circumstances, we think there is a reasonable probability that the jury would have found Harvey guilty of second degree murder in the absence of the erroneous introduction of Bradley's testimony regarding the robbery. The evidence presented to the jury on premeditation, while substantial, was hardly overwhelming. There was no evidence that Harvey planned Brady's killing. Other than the hypothesized robbery and similar speculations, there is no evidence of a motive for the shootings. And while the People correctly point out that the manner of the killing—Brady was shot running away from the scene—may suggest premeditation, the jury may well have found this to be a malicious killing but without premeditation in the absence of the felony-murder instructions. (See generally *People* v. *Anderson* (1968) 70 Cal.2d 15, 26-27 [73 Cal.Rptr. 550, 447 P.2d 942].)

■ We have previously noted the admissible evidence at trial was insufficient to support the felony-murder theory. (See *ante,* pp. 105-106.) Harvey argues that if we so conclude, his retrial on a felony-murder theory is precluded by double jeopardy considerations. The issue raised by Harvey was acknowledged but reserved by the California Supreme Court in *People v. Shirley* (1982) 31 Cal.3d 18, 71, footnote 59 [181 Cal.Rptr. 243, 641 P.2d 775]. The *Shirley* decision on hypnotically induced testimony constituted a new rule of law which made previously admissible evidence inadmissible. The court found the double jeopardy prohibition inapplicable under such circumstances. It declined to address what the result would be if the inadmissibility decision were based on an existing rather than new rule. (*Ibid.*) As the *Shirley* court noted, the United States Supreme Court has also expressly left open this question. (See *Greene v. Massey* (1978) 437 U.S. 19, 26, fn. 9 [57 L.Ed.2d 15, 22, 98 S.Ct. 2151].)

Although we are unaware of any California courts which have addressed the issue reserved by *Shirley,* we are guided by the decisions of several circuit courts of appeals subsequent to *Greene.* Of particular interest is *United States v. Harmon* (9th Cir. 1980) 632 F.2d 812 in which the court, having found certain evidence inadmissible, addressed a defendant's contention that it was obligated to assess the legal sufficiency of the remaining admissible evidence to determine whether retrial was constitutionally prohibited. In concluding that retrial was permissible irrespective of the sufficiency of the untainted evidence, the Ninth Circuit explained as follows: "The untainted evidence introduced by the government does not necessarily reflect all other available evidence of the defendant's involvement. It is impossible to know what additional evidence the government might have produced had the faulty evidence been excluded at trial, or what theory the government might have pursued had the evidence before the jury been different. [Citations.] It would prolong trials unduly to adopt a rule that would require the government to introduce all available evidence and assert every possible legal theory in anticipation of reversal of trial court rulings admitting evidence." (*Id.,* at p. 814.) Other circuits addressing the issue have reached conclusions consistent with *Harmon.* (See *United States v. Tranowski* (7th Cir. 1983) 702 F.2d 668, 671; *United States v. Sarmiento-Perez* (5th Cir. 1982) 667 F.2d 1239, 1240; *United States v. Mandel* (4th Cir. 1979) 591 F.2d 1347, 1373-1374.)

We similarly believe that where a trial court has ruled certain evidence admissible, the prosecutor should be entitled to rely on that ruling in deciding not to introduce other available evidence which might be cumulative, confusing or perhaps not as persuasive. While the prosecution should be encouraged "to make the best case it can at its first opportunity" (*Shirley, supra,* 31 Cal.3d at p. 71), quantity is not synonymous with quality; more

evidence does not always make the "better" case. In addition, as the Supreme Court has noted in another context, "the prosecution . . . of a lawsuit involves the difficult problem of balancing the effectiveness of any given tactic or procedure against its cost in terms of time and expense." (*Hocharian v. Superior Court* (1981) 28 Cal.3d 714, 720 [170 Cal.Rptr. 790, 621 P.2d 829].) The cost-benefit balancing process engaged in by a prosecutor in deciding whether to pursue a line of testimony or introduce additional evidence may be materially affected by the trial court's ruling on the admissibility of other related evidence. The prosecutor's desire to present a manageable case should not require him to act at his peril.

Our conclusion is further supported by our perception of the difficulty in distinguishing a reversal based on a "new" rule—where retrial would be allowed (see *Shirley, supra,* 31 Cal.3d at p. 71)—from one based on "existing" rule—where retrial would be prohibited. Whether a given admissibility issue is "controlled" by existing precedent or requires an "extension" of current law may lie largely in the eye of the beholder.

We believe this problem demands clear standards to guide the conduct of prosecutors who may not have the time for academic contemplation which is, to at least some extent, present in appellate chambers. Given the various policy considerations we have articulated, we therefore hold that where reversal of a conviction is premised on trial court error in admitting evidence against the defendant, retrial is not prohibited notwithstanding that the quantum of admissible evidence at trial may have been legally insufficient to sustain a conviction. Accordingly, while Harvey's conviction of first degree murder must be reversed, he may be retried on either or both a premeditated murder or felony-murder theory.[8]

*Wheeler Error*

The panel of prospective jurors which was sworn included four black individuals. One was excused on motion of the defense attorney for cause. Of the remaining three,[9] two—prospective jurors White and Bryant—

---

[8]We are convinced the jury verdict finding Harvey guilty of the attempted murder of Pierro necessarily indicates it found Harvey's killing of Brady to have been unlawful and with malice. (See § 187.) Therefore, as an alternative to retrying Harvey for first degree murder, the prosecutor should have the option of accepting a modification of the judgment to reflect a conviction of second degree murder. (Cf. *People v. Capps* (1984) 159 Cal.App.3d 546 [205 Cal.Rptr. 898].)

[9]The third black prospective juror, Mr. Fields, was also eventually excused pursuant to the prosecutor's peremptory challenge. The exclusion did not occur, however, until Mr. Fields had alerted the court to the fact that the defendant's father visited Fields' store regularly. Fields stated that if the verdict went against James Harvey, Fields would feel uncomfortable later associating with John Harvey, Sr. Although he felt it would be difficult, Fields nonetheless believed he could evaluate the case impartially. The trial court denied the prosecutor's motion to excuse Fields for cause, whereupon the prosecutor peremptorily challenged him. Defendant does not contend that the prosecutor's exclusion of Fields was due to group bias.

were peremptorily challenged by the prosecutor. After the prosecutor made his second peremptory challenge directed at Mrs. Bryant, defense counsel objected, arguing that the prosecutor's exclusion of two of the remaining three black jurors was a prima facie indication of racially motivated action prohibited by *People* v. *Wheeler* (1978) 22 Cal.3d 258, 276-277 [148 Cal.Rptr. 890, 583 P.2d 748]. The trial judge, however, disagreed: ". . . I have listened with intense interest to the questions and answers of counsel and the prospective jurors, respectively, as well as my questions to the jurors and their responses thereto. I have observed their countenance, and I have not detected at this time such a pattern or any pattern at all on the part of either one of you gentlemen in excluding prospective jurors.

"I did hear the responses of Mrs. Bryant to the questions put to her by both counsel and the court, and I cannot find anything at this juncture that would indicate to me that the challenge of her was based upon either an unconscious or conscious intent on the part of the prosecutor to exclude all blacks from the jury. Indeed, Mr. Fields [the remaining black prospective juror] has been sitting on the jury since the second day, as I recall."

In *People* v. *Wheeler, supra,* 22 Cal.3d 258, the Supreme Court held that the usual freedom associated with the use of peremptory challenges is tempered by the constitutional requirement that the jury be drawn from a representative cross-section of the community. The specific issue in *Wheeler* was whether the prosecutor could use his peremptory challenges to exclude all blacks from a jury trying two black defendants charged with murdering a white victim. In concluding that such use of the peremptory challenge mechanism was improper, the court explained the procedure to be used in determining whether peremptory challenges were being misused. "If a party believes his opponent is using his peremptory challenges to strike jurors on the ground of group bias alone, he must raise the point in timely fashion and make a prima facie case of such discrimination to the satisfaction of the court. First, as in the case at bar, he should make as complete a record of the circumstances as is feasible. Second, he must establish that the persons excluded are members of a cognizable group within the meaning of the representative cross-section rule. Third, from all the circumstances of the case he must show a strong likelihood that such persons are being challenged because of their group association rather than because of any specific bias.

"We shall not attempt a compendium of all the ways in which a party may seek to make such a showing. For illustration, however, we mention certain types of evidence that will be relevant for this purpose. Thus the party may show that his opponent has struck most or all of the members of the identified group from the venire, or has used a dispropor-

tionate number of his peremptories against the group. He may also demonstrate that the jurors in question share only this one characteristic—their membership in the group—and that in all other respects they are as heterogeneous as the community as a whole. Next, the showing may be supplemented when appropriate by such circumstances as the failure of his opponent to engage these same jurors in more than desultory voir dire, or indeed to ask them any questions at all. Lastly, . . . the defendant need not be a member of the excluded group in order to complain of a violation of the representative cross-section rule; yet if he is, and especially if in addition his alleged victim is a member of the group to which the majority of the remaining jurors belong, these facts may also be called to the court's attention." (*Id.,* at pp. 280-281, fns. omitted; see also *People* v. *Hall* (1983) 35 Cal.3d 161, 167 [197 Cal.Rptr. 71, 672 P.2d 854].) The court also expressed reliance on the judgment of trial courts in evaluating claims of racially based exclusion. Trial judges " 'are in a good position to make such determinations, however, on the basis of their knowledge of local conditions and of local prosecutors.' [Citation.] They are also well situated to bring to bear on this question their powers of observation, their understanding of trial techniques, and their broad judicial experience. We are confident of their ability to distinguish a true case of group discrimination by peremptory challenges from a spurious claim interposed simply for purposes of harassment or delay." (22 Cal.3d at p. 281.)

 The critical question in this case is whether defense counsel established a prima facie case that the prosecutor was engaging in a systematic pattern of excluding blacks from the jury. The relevant facts in this regard, suggested by *Wheeler* and presented by defense counsel, are that two of the remaining three black prospective jurors were peremptorily challenged. The prosecutor clearly possessed a motive to exclude black jurors in that the defendant was black while the victims were white. On the other hand, the small number—in absolute terms—of prospective jurors makes it quite difficult to say whether they were homogeneous or heterogeneous with respect to characteristics other than race. Finally, the record does not indicate that the prosecutor's voir dire of Mrs. White and Mrs. Bryant was in any way limited or desultory.

We are thus faced with the question whether a prima facie showing under *Wheeler* is made out when defendant establishes only that the prosecutor has peremptorily challenged two of three prospective jurors who have the same racial background as the defendant and a different racial background from the victim(s). The parameters of a prima facie *Wheeler* showing are illustrated in *Wheeler* and several subsequent cases interpreting it. In *Wheeler* itself, approximately seven black jurors—the only blacks called to the panel—were peremptorily challenged after mere "perfunctory" question-

ing. (22 Cal.3d at pp. 263-265.) More recently in *People* v. *Hall, supra,* 35 Cal.3d 161, the People conceded a prima facie case of exclusion had been established where the prosecutor excused all five black prospective jurors from the panel.

Several decisions by the Courts of Appeal also address the issue. In *People* v. *Rousseau* (1982) 129 Cal.App.3d 526 [179 Cal.Rptr. 892] the only two black prospective jurors on the panel were peremptorily challenged. The court concluded that fact alone was insufficient to establish a prima facie case under *Wheeler.* (*Id.,* at pp. 536-537.) In *People* v. *Fuller* (1982) 136 Cal.App.3d 403 [186 Cal.Rptr. 283], however, the exclusion of three black prospective jurors—the only three on the panel—was deemed to constitute a prima facie case. Significantly, the *Fuller* court recognized that the racial overtones of the case were not as suspicious—both the defendant and the victim were black—and that the prosecutor's voir dire of the black prospective jurors "was not any more desultory than that of the other non-black jurors who were peremptorily challenged." (*Id.,* at p. 420.) In *Holley* v. *J & S Sweeping Co.* (1983) 143 Cal.App.3d 588 [192 Cal.Rptr. 74], the *Wheeler* analysis was applied in a civil case in which three of four black prospective jurors were excluded. The court specifically noted that the three jurors were asked no voir dire questions prior to their exclusion. (*Id.,* at p. 593.) Finally, in *People* v. *Alexander* (Cal.App.) the prosecutor's exclusion of four of the five blacks on the venire was held not to constitute a prima facie case where the court's independent review of the voir dire revealed a basis for suspecting three of the four excluded individuals of specific bias.

We note a considerable tension in this area of the law between the desirability of theoretical consistency and the need to develop workable rules which can be understood and applied by lawyers and trial judges. In theory at least, even the exclusion of a single prospective juror may be the product of an improper group bias. As a practical matter, however, the challenge of one or two jurors can rarely suggest a *pattern* of impermissible exclusion. Assuming that peremptory challenges are not to be replaced with a system requiring that counsel explain the basis for each and every challenge, it would appear that a pattern of exclusion must be evident before *Wheeler's* prima facie case requirement can be satisfied.

The cases interpreting *Wheeler* seem to suggest that absent some apparent alternative explanation, the use of peremptory challenges to exclude three or more prospective jurors where such exclusions operate to eliminate all

or substantially all of the members of a cognizable group from the jury panel is sufficient to establish a prima facie case. The attorney who has so exercised his peremptory challenges must then explain to the court the rationale for his challenges. (See *Wheeler, supra,* 22 Cal.3d at pp. 281-282.)

In the present case, the prosecutor's peremptory challenge of two black prospective jurors does not suggest the necessary pattern of impermissible exclusion to establish a prima facie showing.[10] (See *People* v. *Rousseau, supra,* 129 Cal.App.3d at pp. 536-537.) This is particularly true where the two challenges do not operate to exclude all members of the cognizable class from the jury. Accordingly, we can find no error in the trial court's refusal to require the prosecutor to explain the basis for his peremptory challenges.

### Sua Sponte Instruction on Immunized Witness

■ Focusing on the testimony of Ray Donaldson, Harvey contends he was entitled to a *sua sponte* instruction that because Donaldson received immunity from prosecution in exchange for his testimony, that testimony should be viewed by the jury with distrust. We have no quarrel with the substance of the instruction Harvey suggests. As he points out, it is highly unlikely that a witness whose testimony does not implicate the charged defendant will be afforded immunity. And once a witness has received immunity in the expectation that his testimony will implicate the defendant, contrary testimony at trial—regardless of its truth—will subject him to possible perjury charges. Thus, an immunized witness has a considerable interest in testifying in a manner which is acceptable to the prosecutor.

Had Harvey requested such an instruction, there is no question he would have been entitled to it. But we see no basis for imposing such a *sua sponte* duty on the trial court. (See generally *People* v. *Wickersham* (1982) 32

---

[10]We have independently reviewed the transcript of the voir dire questioning of Mrs. White and Mrs. Bryant. Some suggestions of possible specific biases appear. For instance, Mrs. White lived only a few blocks from the scene of the shooting. She exhibited considerable familiarity with the area. Similarly, Mrs. Bryant was a former resident of the area. The prosecutor may have been concerned that Mrs. White would exhibit unwarranted sympathy for a neighbor boy or that either Mrs. White's or Mrs. Bryant's familiarity with the scene of the shooting would bog them down in the irrelevant details of the testimony.

We, of course, have no way of knowing whether any of these facts actually motivated the prosecutor to excuse either Mrs. White or Mrs. Bryant. Nor is our mention of these possible motivations meant to legitimize the tenuous inferences on which they are based. Nonetheless, we must recognize that peremptory challenges may be based on evidence which is "apparently trivial" and "highly speculative." (*Wheeler, supra,* 22 Cal.3d at p. 275.) We note the facts supporting these possible motivations only to indicate that in the absence of a pattern of impermissible exclusion, such facts counsel against automatically invoking the *Wheeler* mechanism.

Cal.3d 307, 323 [185 Cal.Rptr. 436, 650 P.2d 311].) Here, the jury was informed that Donaldson had been given immunity in exchange for his testimony. They were correctly instructed pursuant to CALJIC No. 2.20 regarding the general factors to use in assessing a witness' credibility, including the presence of bias and self-interest.[11] Harvey's suggested instruction would merely have amplified CALJIC No. 2.20 by pointing out to the jury the specific bias and self-interest which motivated Donaldson's testimony. We do not believe such an amplification instruction was, under these circumstances, "necessary for the jury's understanding of the case." (*People* v. *St. Martin* (1970) 1 Cal.3d 524, 531 [83 Cal.Rptr. 166, 463 P.2d 390]; *People* v. *Wickersham, supra,* 32 Cal.3d at p. 323.)

Even had the instruction been required, the court's failure to give it could in no way be considered prejudicial. The jury was correctly instructed pursuant to CALJIC No. 3.18 that an accomplice's testimony was to be viewed with distrust. Both sides agreed in argument that Donaldson was an accomplice, and thus effectively conceded his testimony was to be distrusted. Moreover, the jury was also given CALJIC No. 2.21, indicating that a witness who is willfully false in one material part of his testimony is to be distrusted in others. The prosecutor who propounded Donaldson's testimony admitted that Donaldson had been willfully false in some of his statements, thus making his entire testimony suspect.

It makes no functional difference whether the jury distrusted Donaldson because he was an accomplice, a liar or an immunized witness. We think it extremely probable that the jury distrusted Donaldson's testimony for a variety of reasons. Under those circumstances, the trial court's failure to

---

[11]The jury was instructed as follows:

"Every person who testifies under oath or affirmation is a witness. You are the sole judges of the believability of a witness and the weight to be given the testimony of each witness.

"In determining the believability of a witness you may consider anything that has a tendency in reason to prove or disprove the truthfulness of the witness including but not limited to any of the following:

"The extent of the opportunity or ability of the witness to see or hear or otherwise become aware of any matter about which the witness has testified;

"The ability of the witness to remember or to communicate any matter about which the witness has testified;

"The character and quality of that testimony;

"The demeanor and manner of the witness while testifying;

"The existence or nonexistence of a bias, interest or other motive;

"Evidence of the existence or nonexistence of any fact testified to by the witness;

"The attitude of the witness toward the action in which testimony has been given by the witness or toward the giving of testimony;

"A statement previously made by the witness that is consistent or inconsistent with the testimony of the witness;

"An admission of the witness of untruthfulness;

"The witness prior conviction of a felony."

focus the jury's attention on Donaldson's bias arising from his immunized status cannot be considered prejudicial. (See *People* v. *Watson, supra,* 46 Cal.2d at p. 836.)

*Exclusion of Evidence of Defendant's Cooperation*

■ Through his own testimony, Harvey sought to establish his cooperative attitude when questioned by the police in conjunction with the 32d Street shootings. Although the basic facts concerning his cooperation were mentioned, the substance of his conversations with various officers—which Harvey says would demonstrate the nature and degree of his cooperation— were excluded by the trial court. Harvey claims this exclusion was error because such evidence was consistent with and would support his claim of innocence. He argues that a defendant in a criminal trial has a constitutional right to present any and all relevant evidence in his defense, and contends that the trial court's exclusion of the evidence denied him due process of law and a fair trial.

Were we writing on a clean slate—and putting to one side considerations of prejudice—we would be inclined to allow introduction of the evidence within some limits, if only because a criminal defendant must be accorded "the benefit of any reasonable doubt when passing on the admissibility of evidence" in his defense. (See *People* v. *Murphy* (1963) 59 Cal.2d 818, 829 [31 Cal.Rptr. 306, 382 P.2d 346].) The People correctly point, however, to an analogous situation which has recently been examined by the Supreme Court: The admissibility of evidence showing an absence of flight which would be consistent with a defendant's innocence.[12] In *People* v. *Green* (1980) 27 Cal.3d 1 [164 Cal.Rptr. 1, 609 P.2d 468], evidence that defendant had not fled from police had been introduced by the prosecution for an unrelated purpose. The defendant sought an instruction based on that evidence to the effect that the absence of flight could be considered as circumstantial evidence of an innocent state of mind. (*Id.,* at p. 36.) In rejecting defendant's argument, the *Green* court reaffirmed and relied on the century-old decision in *People* v. *Montgomery* (1879) 53 Cal. 576 which held that evidence of an absence of flight was inadmissible to suggest a defendant's innocence. After examining the numerous reasons why even a guilty defendant would decide not to flee, the court in *Montgomery* held that the evidence could not be introduced because of the danger it would confuse and mislead the jury. (*Id.,* at pp. 577-578.)

The Supreme Court in *Green* reexamined the *Montgomery* rule and recognized that an absence of flight did give rise to at least some inference of

---

[12]The absence of flight may in reality be considered merely one specie of a defendant's cooperative behavior.

innocence. (See 27 Cal.3d at p. 38.) "The real issue," the court commented, "is not whether this evidence is relevant but whether it should be excluded despite its relevance." (*Ibid.*) It found authority for such exclusion in section 352 of the Evidence Code because the "manifest risk of confusion and delay" outweighed any probative value of such evidence. (*Id.,* at pp. 38-39.) Rejecting a rule which would require individual balancing of the risk of confusion and probative value in individual cases, the *Green* opinion explained that "the *Montgomery* rule thus embodies the view of this court that in all cases the scales tip so heavily against admission of evidence of absence of flight that it must be excluded as a matter of law." (*Id.,* at p. 39.)

We can find no basis for distinguishing evidence of an absence of flight from evidence of a defendant's general cooperation with police in terms of the inference of innocence which may be drawn. Just as there are numerous reasons why a guilty defendant would not flee, there are also numerous reasons why he would appear to be cooperative with the police. Bound as we are by the *Montgomery* rule as interpreted by *Green* (see *Auto Equity Sales* v. *Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937]), we can reach no conclusion other than that the evidence proffered by Harvey was properly excluded.[13]

*Sentencing Error*

 Harvey was sentenced to the upper term of nine years on the attempted murder count with a three-year enhancement for great bodily injury pursuant to section 12022.7. The firearm use enhancement (§ 12022.5) was stayed based on the prohibition in section 1170.1, subdivision (e).[14]

The trial court based its imposition of the upper term on three factors: use of a deadly weapon (Cal. Rules of Court, rule 421(a)(2));[15] the viciousness and callousness of the crime (rule 421(a)(1)); and the fact of premeditation (rule 421(a)(8)). Harvey does not challenge use of the third factor in aggravation, but asserts that because both of the first two were used

---

[13]Even were our conclusion otherwise, however, the exclusion was hardly prejudicial. The basic facts concerning Harvey's cooperation were presented to the jury. Moreover, we have previously indicated that the evidence establishing Harvey committed the shootings is strong and generally unrebutted. (See *ante,* p. 105.) It is not reasonably probable a different result would have been reached had the evidence been admitted. (See *People* v. *Watson, supra,* 46 Cal.2d at p. 836.)

[14]The People suggest that in imposing but staying the section 12022.5 enhancement, the trial court made a mistake which is evidenced by its previously expressed intention to impose the upper term based on the use of a firearm. (See *post,* p. 116.)

[15]All subsequent rule references are to the California Rules of Court.

improperly, resentencing is mandated. We disagree with both his premise and his conclusion.

Harvey argues that the court's use of the deadly weapon factor in combination with the stayed firearm use enhancement constitutes an improper dual use of facts in sentencing. (See generally *People* v. *Ratcliffe* (1981) 124 Cal.App.3d 808, 821 [177 Cal.Rptr. 627].) Rule 441, however, provides a different view. Consistent with Harvey's argument, subdivision (c) states: "A fact used to enhance the defendant's prison sentence may not be used to impose the upper term." Subdivision (b), however, speaks directly to the circumstances of this case: "A fact charged and found as an enhancement may be used to impose the upper term, whereupon the additional term of imprisonment prescribed for that fact as an enhancement shall be stricken. The use of the fact to impose the upper term is an adequate reason for striking the additional term of imprisonment."

The effect of subdivision (b) is to give preference to the use of a fact to impose the upper term rather than as an enhancement. Had an actual prison term been imposed based on the section 12022.5 enhancement, we would need to decide whether the trial court's arguably mistaken use of the same fact to impose the upper term would require that the enhancement be stricken even where the upper term could be independently justified by other facts. Here, however, the People argue persuasively that the trial court did not intend to impose a prison term based on the section 12022.5 enhancement.[16] We thus employ the reasoning of subdivision (b) of rule 441 in ordering the two-year prison term imposed but stayed pursuant to section 12022.5 to be stricken.

Harvey also attacks the court's use of the "viciousness and callousness" factor. He asserts that such qualities are inherent in any attempted murder by use of a firearm where the defendant willfully inflicts great bodily injury. He cites the general rule that it is improper to impose the upper term based on facts which are an inherent part of the charged offense. (See, e.g., *People* v. *Cortez* (1980) 103 Cal.App.3d 491, 495-496 [163 Cal.Rptr. 1].)

We do not believe rule 421(a)(1) need be interpreted so broadly so as to preclude its use as a factor in aggravation here. In imposing the upper term, the trial court certainly has the obligation to go beyond a casual reading of terms which define the factors in aggravation. Applied to rule 421(a)(1),

---

[16]In imposing the upper term, the trial court stated: "Insofar as the circumstances in aggravation in particular in this case that I am relying on for the use of the upper term of nine years in count II is that within the meaning of 421(A)(2) he used a deadly weapon within the meaning of 12022.5. *I am not using 12022.5 to enhance the sentence as to this count because I cannot.* I am prohibited by law from doing so." (Italics added.)

this means the court must convince itself that, when compared to other ways in which such a crime could be committed, the manner of *this crime's* commission indicated viciousness and callousness. (See *People* v. *Moreno* (1982) 128 Cal.App.3d 103, 110 [179 Cal.Rptr. 879] ("The essence of 'aggravation' relates to the effect of a particular fact in making the offense distinctively worse than the ordinary.").) The record here supports such a conclusion. The victim was attacked under circumstances where he had no opportunity to defend himself. There was no provocation of any sort, and Pierro was shot without any explanation. We think these circumstances are sufficient to indicate viciousness and callousness in this attempted murder as distinguished from other attempted murders.

Because Harvey does not challenge the third factor in aggravation utilized by the court, we conclude that the upper term on the attempted murder count was properly imposed.

## DISPOSITION

The judgment of conviction on count one (first degree murder) is reversed. Should the prosecutor so move, the superior court is directed to modify the judgment to reflect a conviction of second degree murder. The judgment of conviction on count two (attempted murder) is affirmed. The prison term imposed but stayed on the section 12022.5 enhancement is ordered stricken.

Butler, J., and Gamer, J.,* concurred.

Appellant's petition for a hearing by the Supreme Court was denied February 14, 1985.

---

*Assigned by the Chairperson of the Judicial Council.