[Crim. No. 15593. Fourth Dist., Div. One. Jan. 29, 1985.]

THE PEOPLE, Plaintiff and Respondent, v.
CHARLES E. JACKSON, Defendant and Appellant.

**[Opinion certified for partial publication.[1]]**

---

[1]Certified for publication with the exception of sections V through XIV.

**COUNSEL**

Geraldine S. Russell, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, and Pat Zaharopoulos, Deputy Attorney General, for Plaintiff and Respondent.

**OPINION**

**STANIFORTH, J.**—Charles E. Jackson appeals his convictions by a jury of fourteen counts of armed robbery (Pen. Code, §§ 211, 12022.5, 1203.06, subd. (a)(1)(iii)[2]); three counts of forcible rape (§ 261, subd. (2)), two counts involving the use of a firearm (§ 12022.3); one count of armed assault with intent to commit rape (§§ 220, 12022.5); one count of attempted rape with use of a firearm (§§ 664/261, 12022.5); one count of attempted sexual intercourse with a minor (§ 664/261.5) and three counts of forcible oral copulation with the use of a firearm (§§ 288a, subd. (c), 12022.5).

---

[2]All statutory references are to the Penal Code unless otherwise specified.

Jackson was found not guilty of one count of armed robbery (§§ 211, 12022.5, 1203.06, subd. (a)(1)(iii)) and one count of attempted forcible rape (§ 664/261, subd. (2)). The offenses involved 14 victims on 10 separate occasions over a 10-month period (Jan. to Oct.) in 1982.

On appeal, Jackson contends the court erred by (1) failing to grant a severance motion as to the counts involving three of the victims; (2) improperly instructing the jury on cross-racial identification; (3) refusing to admit expert testimony on eyewitness identification; (4) failing to suppress statements allegedly obtained in violation of *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]; (5) admitting a prior burglary conviction for impeachment purposes; and (6) failing to make an adequate inquiry under *People* v. *Marsden* (1970) 2 Cal.3d 118 [84 Cal.Rptr. 156, 465 P.2d 44], as to whether Jackson was receiving effective assistance of counsel. Jackson also contends the evidence is insufficient to support one of the forcible rape convictions and the court committed various sentencing errors.

#### FACTS

*Counts 1 through 3: Christine M.*

On January 15, 1982, Jackson opened the door of Christine M.'s car as she was releasing the emergency brake. He was armed with a small silver pistol. He forced her over to the passenger's seat, demanded money and then drove to a parking lot at San Diego City College. Once parked, he rifled through her knapsack and took a small amount of cash and a blank money order for $116.93 (count 1).

Jackson then forced her to orally copulate him (count 3). He ordered her to remove her clothes. When she refused, he hit her on the jaw and right temple with his handgun and raped her (count 2). He then drove the car to 40th and Wightman Streets, not far from his home and left on foot.

Christine then drove to her home. She and her roommate went to Alvarado Hospital. While at the hospital, Christine was interviewed by police. She incorrectly told police the assault had occurred outside the car because she was afraid if she told the truth the police would impound her car for evidence. She told police her assailant was a black male, about six feet tall. She described his clothing and hairstyle.

The next day the stolen $116.93 money order was cashed in the name of "Charles Hill." Jackson's driver's license number was on the back of the

money order. A documents examiner testified Jackson's handwriting matched the handwriting on the money order.

Christine identified someone other than Jackson in a photographic lineup and at a live lineup. At trial, she testified Jackson looked familiar.

During an interview with Officer Yoshonis at the police station on August 11, 1982, Jackson admitted having intercourse with Christine but asserted it was consensual. A tape recording of this interview was played to the jury and was the subject of a motion to suppress.

*Counts 4 through 7: The Kieko San Massage Parlor*

On February 9, 1982, about 7:15 p.m., Jackson rang the bell in the customer waiting area of the Kieko San Massage Parlor. Sun B. responded to the bell. Jackson forced her into the back of the massage parlor. He pointed a small silver gun at her chest. Two other female employees, Imbok Williams and Sung Hong, were in the back of the massage parlor. Jackson ordered these two women to be quiet and to lie down on the floor or he would kill them.

Jackson then demanded money from Sun B. When she refused, Jackson hit her on the forehead and kicked her four or five times. Hong told Sun B. to give Jackson money from a box. Jackson took the money from the box ($70 to $80) (count 4) as well as money from Sun B.'s purse ($40 to $50) (count 5).

Jackson then pulled Williams up off the floor and demanded she take off her clothes. When she refused, he hit her in the eye with his fist and then pointed the gun at her head (count 6). Sun B., fearing for Williams' life, orally copulated Jackson (count 7). Jackson continued to point the gun at Williams. After one to two minutes, the bell rang and Jackson fled down an alley.

Sun B. told police the assailant was 6 feet, 3 inches tall, 175 pounds. She also described his clothing. She did not then tell police about the oral copulation because she did not want the information in the newspaper which might embarrass her two children. In a photographic lineup lacking Jackson's photograph, she picked one out. She, however, positively identified Jackson at a live lineup and in court.

Hong was unable to make an identification.

Williams identified Jackson at a live lineup and in court. She was confident of her identification.

*Counts 8 through 13: The Oriental Bath Parlor*

On April 12, 1982, about 11:30 p.m., Jackson and another man rang the bell in the waiting area of the Oriental Bath Parlor. Yong R. responded to the bell and told the two men they were closing. She then went to the back of the parlor, locking the door behind her. The two men kicked down the door, setting off an alarm. Hak J., who was working at the parlor, heard the alarm, ran out and called the police.

The men followed Yong R. into the kitchen where the owner, Syun Soon Lee, was. The two men demanded money and obtained about $260 from a drawer in the kitchen (count 8). They searched the women's purses but ran out when people arrived in response to the alarm.

Five days later, on April 17, about midnight, Yong R., Lee and Hak J. closed the Oriental Bath Parlor and were walking to their cars when Jackson and two other men approached.

Jackson went to Lee's car and tried to grab her handbag. She passed out. Jackson brought her into the bath parlor. Later, she discovered $20 missing from her purse and $20 missing from the kitchen drawer of the parlor (count 10). Lee was unable to identify any of the three men.

The other two men went to Yong R.'s car. They were both armed. They took Yong R.'s purse, necklace and wristwatch (count 11) and Hak J.'s purse which contained a distinctive daisy-shaped watch as well as money (count 12).

The men ordered Yong R. to unlock the door to the Oriental Bath Parlor. She complied and everyone went inside. Once inside, the men demanded more money. Then, Jackson took Hak J. to one room and the smallest man took Yong R. to another room where he raped her.

Yong R. heard arguing coming from the room where Jackson had taken Hak J. Jackson told Hak J. to take off her clothes. She refused. She said "I have a husband and child. Leave me alone." Jackson hit her, choked her and threw her onto a bed. Hak J. *testified* "he took my clothes off, and then attack[ed] me." (Count 13.)

After the three men left, Hak J. was found lying on the floor in the kitchen, crying. She could not speak and eventually lost consciousness. The police officer who arrived at the scene thought Hak J. appeared to be in a state of shock. He checked to see if she was still alive and then called paramedics.

Hak J. woke up at the hospital and the doctor asked if she had been raped. She refused to tell him because she was ashamed and in great shock from what had happened. After returning from the hospital, police asked her exactly what had happened. She told them she did not feel like making any comment.

Jackson contends there is insufficient evidence to support a conviction for forcible rape of Hak J.

Hak J. selected Jackson's photograph at a photographic lineup and was positive in her identification at trial, explaining she had no difficulty distinguishing black people because her husband is black.[3]

Yong R. selected three photographs in a photographic lineup as resembling the assailant. None of these photographs was of Jackson. She did not attend the live lineup. At trial she positively identified Jackson, testifying that the structure of his face and the shape of his eyes and nose were that of the assailant.

*Counts 14 through 15: Hong Kong Massage Parlor*

On May 22, 1982, about 11 p.m., Jackson went to the Hong Kong Massage Parlor and asked for a massage. As Chung Hollander, an employee, turned to get a towel, Jackson grabbed her and pointed a small "spoon"-colored gun to her head. Jackson and Hollander walked back to the kitchen of the massage parlor where two other women employees were.

Sun Nam Burless saw Jackson and Hollander enter the kitchen. Jackson ordered the two other women to lie down on the floor. He demanded money. Hollander gave him $25 to $30 from a desk drawer (count 14). Jackson also emptied Burless' purse and took a $50 bill (count 15).

Glenn Hollander came to the back door of the massage parlor about 11:15 p.m. to pick up his wife Chung. He saw Jackson between the kitchen and back door. Jackson walked towards Glenn Hollander and told him to lie down in the other room or he would kill him. Hollander kneeled next to his wife and the two other women.

Chung Hollander did not identify anyone at the live lineup. At trial she testified Jackson's height and body seemed similar to the robber's but Jackson's nose seemed narrower. Glenn Hollander testified Jackson's height and

---

[3]Hak J. also identified Jackson at the preliminary hearing and became so upset she fainted and had to be taken to the hospital.

weight was consistent with the robber's. Burless tentatively identified Jackson at the live lineup. At trial, she was positive Jackson was the man who had twice robbed her. She noted Jackson at trial had grown a mustache and gained some weight.

*Count 18: Gina H.*[4]

On the morning of August 9, 1982, Jackson saw Gina H. at the Wonder Games Arcade. *Gina knew Jackson as "Charles."* He asked her to go to his apartment so he could show her something. She agreed. She had been to his apartment before.

Once they arrived at the apartment, Jackson showed Gina a man's watch and asked if she wanted it. She answered "Yeah, I guess." Gina then went into the bathroom to fix her hair. Jackson followed and asked her to have sex with him. She refused.

Jackson then forced her into the bedroom and pushed her down on the bed. He tore off her shorts, ripping the zipper. He attempted to rape her. No penetration occurred. He then demanded she orally copulate him. She refused. He got back on top of her and ejaculated. He then left the room, saying "Consider yourself raped."

Gina got up, washed, dressed and left the apartment. She saw a police car at a nearby Pizza Hut and went inside to report the crime. Officer Fasching was eating lunch at the Pizza Hut when Gina, nervous and shaking, came in and asked for help. She was holding her pants together with her hand because the zipper was broken. She started crying while telling him what happened. She showed the officer where Jackson lived, but no one was home. The officer then took a description.

The day after the incident she told an officer she was not willing to go to court. At trial, she testified, identifying Jackson as her assailant. In an interview with police, Jackson said Gina had been to his apartment a number of times during which they had oral sex. He said she orally copulated him on the date in question and he tried to have vaginal intercourse but failed to achieve penetration because she was a virgin.

Sometime during the summer of 1982, Gina's sister, Delia, saw Jackson give a gold watch to a girl named Janine. Delia later obtained the watch.

---

[4]Count 16 charged an armed robbery of Bu Soon Park at the Geisha House Massage Parlor on June 12, 1982. She was not positive in her identification of Jackson as the robber and failed to select Jackson in a photographic lineup.

Count 17 charged an attempted forcible rape of Gina H. on August 9, 1982.

Jackson was acquitted on counts 16 and 17.

At trial, Delia turned the watch over to a prosecution investigator. The watch was admitted into evidence.

Hak J. was recalled to testify. She identified the watch as the one she lost during the robbery of April 17, 1982.

*Counts 19 through 22: Five East Pearl Shop*

On September 11, 1982, about 7:40 a.m., just after Lien P. had entered the Five East Pearl Shop and was about to lock the front door behind her, Jackson walked inside. He said he was looking for an old man. Lien P., believing Jackson was referring to the previous owner, told him the man had moved long ago. Jackson then showed her a small black gun.

Lien P. gave Jackson her purse which contained about $30 and told him to go. He did not leave so she gave him an additional $60 from a tin (count 19). Jackson told her to sit on the floor by the bathroom and turn her head away. Lien heard Jackson rummaging through the shop. Jackson then ordered her to sit in the bathroom.

About five minutes later, he returned to the bathroom. He demanded she orally copulate him. When she refused, he struck her three times near her right eye. She orally copulated him (count 20). He then attempted to rape her (count 21) and forced her to orally copulate him again (count 22).

Lien P. positively identified Jackson as her assailant both at a live lineup and at trial.

*Counts 23 through 24: Hesa Ko Massage Parlor*

On September 23, 1982, about 10 a.m., Jackson went to the Hesa Ko Massage Parlor. The owner, Yon Cha Kim, asked if he wanted a massage. Jackson pulled a small black gun out of a newspaper and pointed it at Kim's chest.

Sun Burless, who had been in the bathroom, came out and recognized Jackson as the man who had robbed her on May 22 at the Hong Kong Massage Parlor.

Jackson directed Burless and Kim to lie down on the floor. He searched the office. He took their purses and removed their jewelry as they were lying down (counts 23, 24). Jackson tied up both women and left when another employee, Soo Im Moon, arrived.

At a photographic lineup, Kim first selected a photograph of someone other than Jackson, saying she was not sure, but then picked out Jackson's photograph. She was then positive in her identification. She also identified Jackson at trial. Burless told police Jackson was the same man who robbed her previously (May 22). She tentatively identified Jackson at the lineup and was positive in her identification at trial. Moon identified Jackson as the robber both at a live lineup and at trial.

*Count 25: Maria M.*

On October 5, 1982, about 9 p.m., while Maria M. and her infant daughter were sitting in her apartment watching television, Jackson entered. He held a small black gun. Jackson had been at the apartment a couple of times four or five months before to see Maria's boyfriend. Maria recognized Jackson but did not know his name.

Jackson ordered Maria to go into the bedroom. Maria complied, carrying her child with her. Jackson left the bedroom. Maria heard Jackson turn off light switches, unscrew the kitchen lightbulb and use the telephone in the baby's room.

Jackson returned to the bedroom. He ordered Maria to remove her clothes and threatened to harm her or her child if she did not comply. He then raped her. When the baby started to cry, Jackson became nervous. He left, warning her not to tell her boyfriend Eddie. After he left, Maria called police.

Maria identified Jackson at the live lineup and at trial. The police found Jackson's fingerprints on the kitchen lightbulb.

*The Defense*

Jackson did not testify. His defense to the counts involving Christine M.,[5] Gina H., and Maria M. was consent. To the counts involving the massage parlors and other businesses, Jackson's defense was misidentification. He called four witnesses: the police officer who conducted a photographic lineup and the live lineup; a defense investigator who conducted two photographic lineups of black-and-white photographs, one lineup containing Jackson's photograph, the other not containing it; the owner of a motel near the Oriental Bath Parlor who (without his glasses on) saw the suspects flee down a darkened alley and estimated the height of the taller one to be five feet,

---

[5]Jackson in a police interview originally denied any knowledge of the Christine M. incident, claiming he was in Los Angeles from January 12 through 22. Later, Jackson abandoned this claim of alibi.

ten inches (Jackson's driver's license lists him as six feet, three inches) but stated he would "definitely not" be able to make any identification; and Gina H.'s mother who testified sometimes Gina tells the truth and sometimes she does not.

DISCUSSION

I

 Jackson contends the court prejudicially erred in denying his motion to sever the counts involving massage parlors and other businesses (counts 4 through 16, 19 through 24) from those involving attacks on individual women, i.e., Christine M. in her car, Gina H. in Jackson's apartment, and Maria M. in her home (counts 1 through 3, 17 through 18, and 25). He claims the Christine/Gina/Maria counts, where identity was not an issue, were used to prove the identity in the remaining counts. He asserts this use of the Christine/Gina/Maria counts was improper because the modus operandi used to commit the Christine/Gina/Maria offenses was neither distinctive nor similar to the modus operandi used in the remaining counts and therefore, could not be used to establish identity in the remaining counts. (See *People* v. *Tassell* (1984) 36 Cal.3d 77 [201 Cal.Rptr. 567, 679 P.2d 1]; *People* v. *Thompson* (1980) 27 Cal.3d 303 [165 Cal.Rptr. 289, 611 P.2d 883].)

These counts were lawfully joined (§ 954; *People* v. *Moran* (1973) 33 Cal.App.3d 724, 728 [109 Cal.Rptr. 287]; *People* v. *Rhoden* (1972) 6 Cal.3d 519, 524 [99 Cal.Rptr. 751, 492 P.2d 1143].) Under section 954, a court may, in its discretion, order severance of properly joined counts "in the interests of justice and for good cause shown." The defendant bears the burden of establishing that denial of severance is prejudicial. (*People* v. *Meneley* (1972) 29 Cal.App.3d 41, 52 [105 Cal.Rptr. 432].) A judge has broader discretion in refusing severance than in admitting evidence of uncharged similar offenses because in the balancing of probative value against prejudicial effect, distinct additional factors favor joinder. (*People* v. *Matson* (1974) 13 Cal.3d 35, 41 [117 Cal.Rptr. 664, 528 P.2d 752]; *People* v. *Poon* (1981) 125 Cal.App.3d 55, 73 [178 Cal.Rptr. 375].) "Joinder of related charges . . . ordinarily avoids needless harassment of the defendant and the waste of public funds which may result if the same general facts were to be tried in two or more separate trials." (*People* v. *Brock* (1967) 66 Cal.2d 645, 655 [58 Cal.Rptr. 321, 426 P.2d 889], disapproved on other grounds in *People* v. *Cook* (1983) 33 Cal.3d 400, 413, fn. 13 [189 Cal.Rptr. 159, 658 P.2d 86]; see also *Kellett* v. *Superior Court* (1966) 63 Cal.2d 822, 826-827 [48 Cal.Rptr. 366, 409 P.2d 206].) Thus,

a stronger showing of prejudice must be made to support a motion for severance than to support a motion to exclude uncharged similar offenses. (*Coleman* v. *Superior Court* (1981) 116 Cal.App.3d 129, 138-139 [172 Cal.Rptr. 86], cert. den. 451 U.S. 988 [68 L.Ed.2d 846, 101 S.Ct. 2325].) The burden of showing prejudice is a heavy one and it has been noted that when the counts are properly joined " 'the difficulty of showing prejudice from denial of severance is so great that courts almost invariably reject the claim of abuse of discretion.' " (*People* v. *Matson, supra,* 13 Cal.3d 35, 39.)

 To support his assertion the prosecution improperly and prejudicially urged the jury to consider the Christine/Gina/Maria counts to convict him in the remaining counts, Jackson makes several citations to the prosecutor's closing argument. Most of these references are to three items: (1) a "small silver pistol" used in the offenses involving Christine (Jan. 15), the Kieko San Massage Parlor (Feb. 9), the Oriental Bath Parlor (Apr. 12) and the Hong Kong Massage Parlor (May 22); (2) a "small black gun" used in the offenses involving the Five East Pearl Shop (Sept. 11), Hesa Ko Massage Parlor (Sept. 23) and Maria M. (Oct. 5); and (3) a watch belonging to Hak J. taken during a robbery of the Oriental Bath Parlor (Apr. 17) and eventually given to Gina's sister by Jackson.

An examination of the record reveals the prosecutor, contrary to Jackson's assertion, did not argue a common plan or scheme existed between the Christine/Gina/Maria counts and the remaining counts which could be used to establish identity in those counts. The prosecutor did not argue the assault on Christine was committed in a manner similar to the massage parlor robberies; rather, she asserted Christine had seen Jackson in possession of a small silver pistol. Similarly, the prosecutor did not argue the assault on Maria, which took place in her home, was similar to the Five East Pearl Shop or Hesa Ko Massage Parlor offenses, but only that Maria had seen Jackson in possession of a small black gun. Finally, the prosecution did not argue the attempted forcible rape/intercourse with Gina was similar to the robbery at the Oriental Bath Parlor when Hak J.'s watch was stolen but only that Gina's sister had seen Jackson in possession of Hak J.'s watch. Thus, all these arguments by counsel relate not to a common plan, scheme or modus operandi, but rather to whether Jackson possessed certain weapons or the fruit of a specific crime. This evidence was properly admitted and comment thereon was within due bounds. Even if the Christine/Gina/Maria counts had not been charged, these women could have testified to Jackson's possessing these various incriminating items.

Nor do Jackson's remaining references to the prosecutor's closing argument support his claim of prejudice. The first citation refers to the court's rejection of a jury instruction "relating to the interrelationship of the mul-

tiple counts" and assent to the prosecutor's desire to argue along that line. This was not before the jury; therefore, the jury cannot be said to have been prejudiced.

The second complaint of wrongdoing relates to the prosecutor's argument concerning the armed robberies and forcible sex offenses committed against Lien P. at the Five East Pearl Shop. She said: "The area of the injuries again, the right side of the head up by the eye. Two other women we know for sure he has done that to. The pattern of the actions and behavior, which is significant and repeated. Those patterns and those circumstances are evidence which corroborate the fact that Mrs. [P.] was correct in her identification." This language is at most ambiguous since, by our count, there were not one but four women who were struck in that general area: Christine M., Sun, Williams and Lien P.

The final error charged is: "You have the rape of Maria M. That is an identification by an eyewitness, corroborated by the fingerprint. Circumstantial evidence that proves he was there. Now those are three cases in which you don't have people coming in and saying 'That is the man. I remember him.' But you have corroboration. You have three situations of forcible assault on different women over a different time frame in the San Diego community." Jackson's complaint (although in context of the argument by the prosecutor) seems addressed primarily to the issue of corroborating eyewitness identification and rebutting the defense arguments as to the unreliability of eyewitness identification. It lends no support to Jackson's claim of prejudicial argument by the prosecutor.

Even if it be conceded, arguendo, the prosecutor used the Christine/Gina/Maria counts improperly, reversal is not required since it is not reasonably probable a different result would have occurred absent the error. In the first place, the identifications of Jackson in the massage parlor/business offenses were well supported by eyewitness testimony of multiple victims and only tangentially supported by inferences drawn from dissimilar offenses committed against Christine, Gina and Maria.

Second, the record demonstrates the jury was well able to keep the counts separate and did not unduly rely on a common modus operandi, plan or scheme to convict Jackson. The jury acquitted him of the armed robbery of Bu Soon Park at the Geisha House on June 12 (count 16). This count involved a pattern of conduct similar to many of the other massage parlor/business offenses but, apparently, because Park was not positive in her identification of Jackson and there were no other witnesses to corroborate her tentative identification, the jury found a reasonable doubt about identification. We conclude the jury considered each count individually. It is sheer

speculation to conclude it relied on a common plan or scheme even among the massage parlor/business offenses to establish identity.[6]

## II

■ Jackson contends the trial court refused to properly instruct the jury on cross-racial identification.

■ The trial court has a duty to give requested defense instructions which direct the jury's attention to evidence from which the jury could infer a reasonable doubt of the defendant's guilt. (*People* v. *Guzman* (1975) 47 Cal.App.3d 380, 387 [121 Cal.Rptr. 69].) Under this rule a defendant is entitled to an instruction relating identification to reasonable doubt. (*People* v. *Hall* (1980) 28 Cal.3d 143, 158-160 [167 Cal.Rptr. 844, 616 P.2d 826]; *People* v. *Sears* (1970) 2 Cal.3d 180, 190 [84 Cal.Rptr. 711, 465 P.2d 847].) ■ Where a proffered instruction is erroneously refused, this court's decision whether the error was harmless depends on the particular facts of the case and on the specific instruction refused. (*People* v. *West* (1983) 139 Cal.App.3d 606, 609-610 [189 Cal.Rptr. 36].) ■ If defense counsel accedes to an erroneous instruction and expresses a deliberate tactical reason for his or her decision, then, under the doctrine of "invited error," any objection is deemed waived and a reversal may not be obtained on that basis. (*People* v. *Wickersham* (1982) 32 Cal.3d 307, 330-335 [185 Cal.Rptr. 436, 650 P.2d 311]; *People* v. *Graham* (1969) 71 Cal.2d 303, 318 [78 Cal.Rptr. 217, 455 P.2d 153].)

Here, the People tendered and the court gave the following instruction: "The burden is on the State to prove beyond a reasonable doubt that the defendant is the person who committed the offense with which he is charged. You must be satisfied beyond a reasonable doubt of the accuracy of the identification of defendant as the person who committed the offense before you may convict him.

"In appraising the identification testimony of a witness, you may consider anything that has a tendency in reason to prove or disprove the identification including but not limited to any of the following:

"1. Whether the witness had an adequate opportunity to observe the offender, considering such factors as:

"a. the amount of time the witness had to view the offender

---

[6]The trial court, in denying the severance motion, also pointed out if the offenses were tried separately, Jackson could be subjected to separate enhancements for prior convictions for the first tried offenses when sentence was imposed in the latter tried offenses.

"b. the lighting conditions at the time of the initial viewing

"c. the number of offenders involved

"d. the relative positions and distances between offender and witness

"e. the emotional state of the witness

"2. Whether the witness had the capacity to observe the offender considering any impairment to the vision which significantly interfered with the witnesses ability to see.

"3. Whether the witness was able or unable to make an out-of-court identification considering such factors as:

"a. the length of time between the event and the next opportunity of the witness to view the offender

"b. the circumstances of the out-of-court identification procedures

"c. whether the method of out-of-court identification was photographic or live

"d. what care, if any, was taken by the directors of the out-of-court identifications to allow independent selections absent any influences or distractions.

"4. Whether the witness was able or unable to make an in-court identification, considering such factors as:

"a. the presence or absence of other members of the defendant's race in the courtroom at the time

"b. what effect if any this may have had on the identification

"c. the demeanor of the witness during the identification

"d. all the circumstances of the in-court identification which may have assisted or hindered that identification.

"5. Whether there has been any exchange of information between witnesses which may have affected any in-court or out-of-court identifications.

"6. Prior physical descriptions of the perpetrator which are consistent or inconsistent with the physical make-up of the defendant.

"7. Any difference in race between the witness and the person he is attempting to identify.

"8. If racial differences do exist between the witness and the person he or she is attempting to identify, the existence or absence of frequent contacts between the witness and members of the differing race.

"9. Whether the witness had failed to select the defendant in an out-of-court identification procedure.

"10. Whether the witness has selected another in an out-of-court identification procedure.

"11. Whether there is a consistent in or out-of-court identification by another witness to the same event and the circumstances of that identification.

"12. Whether there is an inconsistent in or out-of-court identification by another witness to the same event and the circumstances of the identification.

"13. Whether there is independent, direct or circumstantial evidence that supports or weakens the witnesses identification.

"If, from all the circumstances relating to the identification, you have a reasonable doubt whether defendant was the person who committed the offense, you must give the defendant the benefit of that doubt and find him not guilty."

Defense counsel objected to item number 8, contending it "flies in the face of psychological research." The court offered to replace this instruction with a general one based on *People* v. *West, supra,* 139 Cal.App.3d 606, 609. Defense counsel refused, stating "No, I would rather have the instruction the Court proposed to give than that."

Thus defense counsel chose to accede to the instruction offered by the court and refused a general instruction which omitted the allegedly objectionable part. Under these circumstances, any error here was invited.

 Moreover, since the jury was instructed it must be satisfied beyond a reasonable doubt as to the accuracy of the identifications, the objectionable instruction was but one among a list of numerous relevant factors and since defense counsel thoroughly argued the cross-racial identification issue in closing argument, any error in instructing the jury to consider "the exis-

tence or absence of frequent contacts between the witness and members of the differing race" was harmless.

### III

■ Jackson contends the court erred in ruling his proffered expert testimony on eyewitness identification was inadmissible.

Jackson proposed to call Dr. Alvin Marks, a psychologist and "expert in eyewitness identification." Defense counsel explained Dr. Marks would not offer an opinion about the reliability of any particular witness identification but rather would testify about various studies and experiments involving psychological factors affecting eyewitness identification, including inferences on cross-racial identification, weapon focus and the effect of stress. The trial court excluded the expert's testimony because the subject (1) was not yet scientifically reliable, (2) was a matter of general knowledge and (3) was a fit subject for argument rather than an expert's testimony. The court then stated it intended to give detailed instructions on eyewitness identification based on *People* v. *West, supra,* 139 Cal.App.3d 606, relating the matter to the facts of the case at bar and would allow defense counsel to refer in argument to "specific experiences, to journals, periodicals, et cetera."

The Courts of Appeal, including this court, have in the past uniformly found no abuse of discretion when the trial court had excluded expert testimony on eyewitness identification. (*People* v. *Bradley* (1981) 115 Cal.App.3d 744, 751-752 [171 Cal.Rptr. 487]; *People* v. *Brooks* (1975) 51 Cal.App.3d 602, 608-609 [124 Cal.Rptr. 492], cert. den. 424 U.S. 907 [47 L.Ed.2d 738, 96 S.Ct. 1469]; *People* v. *Guzman, supra,* 47 Cal.App.3d 380, 385-386; *People* v. *Johnson* (1974) 38 Cal.App.3d 1, 6-7 [112 Cal.Rptr. 834].) However, the California Supreme Court in *People* v. *McDonald* (1984) 37 Cal.3d 351 [208 Cal.Rptr. 236, 690 P.2d 709], recently addressed this issue, rejected the reasoning of *Johnson, supra,* and its progeny and concluded: "When an eyewitness identification of the defendant is a key element of the prosecution's case *but is not substantially* corroborated by evidence giving it independent reliability, and the defendant offers qualified expert testimony on specific psychological factors shown by the record that could have affected the accuracy of the identification but are not likely to be fully known to or understood by the jury, it will ordinarily be error to exclude that testimony." (37 Cal.3d at p. 377; italics added; fn. omitted.)

Without doubt, the eyewitness identifications of Jackson were the elements of the prosecution's case in the Sun B. rape (counts 4-7) and the Lien

P. crimes (counts 19-22), where the eyewitness (victim) identifications were not substantially corroborated by evidence giving them independent reliability.

Jackson concedes identity was not the key element in the offenses involving Christine, Gina and Maria since both Gina and Maria knew Jackson previously and Jackson admitted the incidents involving Christine and Gina. He contends the acts were consensual.

The People argue all eyewitness testimony was corroborated since in each case more than one eyewitness testified, therefore, each witness' testimony was corroborated by another eyewitness. This specie of corroboration is not sufficient under *McDonald* to give eyewitness identification testimony independent reliability where seven eyewitnesses testified McDonald was the perpetrator.

Nor can a common plan or scheme form the basis here of independent corroboration. While there were some common elements to the offenses, e.g., the use of a small gun (black or silver), the movement towards the kitchen area of the massage parlors, having the women lie down on the floor, the striking of women on the head, none of these elements are unusually distinctive; furthermore there are some significant differences, e.g., more than one assailant was involved in certain of the crimes.

The expert offered was qualified to testify on subjects very similar to those involved in *McDonald*. These were "specific psychological factors shown by the record that could have affected the accuracy of the identification but are not likely to be fully known to or understood by the jury." (*People* v. *McDonald, supra,* 37 Cal.3d 351, 377.) Thus, under the *McDonald* rationale, there was an abuse of discretion in excluding the expert's testimony on eyewitness identification.

## IV

■ The critical question remains whether the exclusion of the expert testimony was prejudicial error requiring reversal. The Supreme Court held in *McDonald* the harmless error rule of *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243], applied but noted "An error that impairs the jury's determination of an issue that is both critical and closely balanced will rarely be harmless." (*People* v. *McDonald, supra,* 37 Cal.3d 351, 377.) The court went on to state: "We reiterate that the decision to admit or exclude expert testimony on psychological factors affecting eyewitness identification remains primarily a matter within the trial court's discretion; like the court in *Chapple,* 'we do not intend to "open the gates" to a flood of expert evidence on the subject.' (660 P.2d at p. 1224.) We expect that such evidence will

not often be needed, and in the usual case the appellate court will continue to defer to the trial court's discretion in this matter." (*Id.*, at p. 377; fn. omitted.)

The Supreme Court in *McDonald* found the trial court's exclusion of the expert's testimony was a prejudicial abuse of discretion. However, *McDonald* was a closely balanced case. In *McDonald*, the defendant was accused of murder. The victim was shot during an argument on the corner of a busy intersection during rush hour. The entire event lasted only a few minutes. Eight eyewitnesses testified; four made positive identifications in court, three made tentative identifications (ranging from having doubts about the identification to feeling it was debatable whether they could identify the perpetrator) and one was positive McDonald was *not* the perpetrator. Of the four witnesses who made positive in-court identifications, three admitted their view was obscured by parked and moving cars, two admitted they were frightened at the time of the incident and one testified she deliberately kept her eyes averted from the perpetrator because of fear. None of the witnesses made a positive identification during the pretrial photographic lineup. No other evidence connecting McDonald to the crime was presented by the prosecution.

McDonald presented six witnesses who testified he was in Saraland, Alabama, visiting relatives at the time of the shooting. Various aspects of the witnesses' testimony was corroborated by cards sent by McDonald and telephone records.

The Supreme Court noted the evidence on the accuracy of the eyewitness identifications was far from clear and "there were elements that could have raised reasonable doubts as to the accuracy of the identification. These elements included the suddenness and unexpectedness of the event, discontinuity and other difficulty of observation, fear and other stress at the time of perception, overestimation of the duration of the event, 'feedback' factors following the event, failure or uncertainty of several witnesses in selecting defendant's photograph from police displays, and, particularly important, apparent cross-racial identification discrepancies." (*People* v. *McDonald, supra,* 37 Cal.3d 351, 375-376.) The court concluded the error in excluding the expert testimony was not harmless "given the potential weaknesses in the prosecution's testimony and the presence of both eyewitness and alibi testimony favorable to the defense." (*Id.*, at p. 376.) The court also noted the closeness of the case was illustrated by the length of the deliberations which took three and half times longer than it took to put on the entire prosecution and defenses cases. (*Ibid.*, fn. 23.)

This case is not closely balanced as was *McDonald.* This case does not have the inbuilt "elements that could raise a reasonable doubt as to the

accuracy of the identification." First, the offenses did not occur on a busy street corner with the witnesses' views obscured by parked and moving vehicles. The offenses took place in lighted interiors. On most occasions, several witnesses were in the same room in close proximity observing the perpetrator. Second, each of the offenses was of a comparative long duration. This was not a momentary fleeting-street-crime glimpse of the criminal. Third, some of the witnesses were positive in both their pretrial identifications. Some witnesses had twice been victimized by Jackson. They recognized him at the second crime scene as the robber/rapist of the earlier crime. Fourth, Jackson did not present any alibi to any of these offenses although there were seven separate occasions occurring over a period of many months. Fifth, the jury acquitted on one of the counts where the eyewitness testimony was weak, thus indicating the jury carefully considered the issue of accuracy of eyewitness identifications. Sixth, there is the "hard" evidence of the watch. This evidence was taken in a rape/robbery where there was no identification problem. The watch confirms Jackson as the rapist/robber in at least one of the Oriental massage rape/robbery crimes (counts 8-13).

Finally, the testimony of an expert on eyewitness identification is not the sole method of assuring the jury will be informed of the various psychological factors which affect accuracy of identifications. Indeed, an expert's testimony has limitations when he or she testifies only to generalities and statistics and not as to whether particular factors affected a specific witness.[7]

Jackson asserts there were six areas where expert testimony could have aided the jury.

1. The difficulties involved in cross-racial identification.[8] During cross-examination, defense counsel brought out that several of the witnesses had identified someone other than Jackson during the out-of-court identification procedures; during the preliminary hearing and trial Jackson was the only black male in the courtroom; and one of the victims was afraid of black men in general. During closing argument, defense counsel emphasized the difficulty in identifying someone of another race.[9] Finally, several of the

[7]E.g., the Supreme Court in *McDonald* pointed to laboratory experiments documented in *Cross-Racial Identification Errors in Criminal Cases* (1984) 69 Cornell L.Rev. 934, 942-943, and noted "it is common for own-race/other-race recognition rates to differ by as much as 30 percent." (*People* v. *McDonald, supra,* 37 Cal.3d 351, 368.) This statistic shows also that own-race/other-race recognition rates agree by at least 70 percent and says nothing about whether a specific witness falls within the 70 percent or the 30 percent bracket.

[8]Jackson is a black male. One victim was also black (Gina H.). The others were Caucasian, Korean, Vietnamese or Mexican-American.

[9]Defense counsel also argued one of the witnesses, Lee, admitted she had difficulty in telling one black from another. In fact, her testimony did not give substance to this argument.

items in the eyewitness identification instructions directed the jury to consider the difficulties inherent in cross-racial identification.[10]

2. "Weapon focus" may impair ability to describe the suspect. Defense counsel highlighted this issue in closing argument by noting the witnesses uniformly seemed able to describe the gun but were not as capable of describing the assailant, e.g., the color of his eyes. Defense counsel argued: "Every single person had something to say about the gun. That is an example of what is known as weapon focus. A tendency of the person assaulted to look at the weapon that might be used against him or her. When someone is robbing you, or threatening you with assault, consider what you are going to do. Are you going to look at the person's face, and study it to get ready for in-court testimony later, or look at that gun to see whether that gun is going to be used against you? It is a distraction, and impairs identification and one's ability to accurately identify someone in court, or elsewhere." Counsel's argument duplicated the expert's proffered testimony. Furthermore, this fact is largely a matter of common sense once it is pointed out.

3. The effect of cultural or language barriers on retrieval of information and communication. This issue surfaced during the trial since (a) 10 eyewitnesses testified through an interpreter, (b) several victims testified they did not speak to police immediately after the incident because they spoke broken English, (c) some police officers who interviewed the victims had difficulty in understanding because of the language problem; an officer noted it took police about 15 minutes before they even realized the victims spoke English. An expert testifying the language/cultural barrier affected police investigation would be pointing to the obvious conclusion arising from witness testimony.

4. Multiple opportunities to view Jackson before trial as affected independent recollection and in-court identification. During closing argument, defense counsel directed the jury's attention to the fact the victims had an opportunity to view Jackson on many different occasions and to talk among themselves. He argued this could affect the in-court identification. Defense

---

[10]"4. Whether the witness was able or unable to make an in-court identification, considering such factors as:

"a. the presence or absence of other members of the defendant's race in the courtroom at the time

"b. what effect if any this may have had on the identification

" . . . . . . . . . . . .

"7. Any difference in race between the witness and the person he is attempting to identify.

"8. If racial differences do exist between the witness and the person he or she is attempting to identify, the existence or absence of frequent contacts between the witness and members of the differing race."

counsel also pointed out at the preliminary hearing and trial Jackson was the only black male in the courtroom, clearly the accused; this factor may have affected in-court identifications. Several of the items in the instruction on eyewitness identification also directed the jury to carefully consider this area.[11]

5. The memory loss that occurs during the lapse of time between the offenses and the trial testimony. On cross-examination, defense counsel brought out that some of the witnesses could not recall their prior identifications. In closing argument, defense counsel brought out this point and conceded: "Common sense, I think, tells you the certainty of one [sic] identification is going to deteriorate over time." A jury instruction directed the jury to consider "the length of time between the event and the next opportunity of the witness to view of the offender." (Item 3 (a).)

6. The nature of the event, including suddenness, physical conditions, opportunity to view the suspect and the emotional effect on the witness to perceive the suspect, including fear, anxiety and anger. On cross-examination, defense counsel elicited testimony showing the witness' fear affected the ability to perceive and to recall. (Sung Hong: "I was so nervous and frightened, I don't remember his clothes." Hyung Soon Lee: "I didn't see them clearly because I was so scared." Yong R.: "I was so scared the whole thing was fuzzy.") During closing argument, defense counsel brought out the effect of stress and fear on perception and recall. Finally, the jury was instructed to consider "the emotional state of the witness" as affecting the witness' opportunity to view the offender. (Item 1 (e).)

Additionally, during closing argument, defense counsel argued the unreliability of eyewitness identification generally. He quoted from the United

---

[11]"3. Whether the witness was able or unable to make an out-of-court identification considering such factors as:
"..........................
"b. the circumstances of the out-of-court identification procedures
"d. what care, if any was taken by the directors of the out-of-court identifications to allow independent selections absent any influences or distractions.
"4. Whether the witness was able or unable to make an in-court identification, considering such factors as:
"a. the presence or absence of other members of the defendant's race in the courtroom at the time
"b. the effect if any this may have had on the identification
"..........................
"5. Whether there has been any exchange of information between the witnesses which may have affected any in-court or out-of-court identifications." (P. 239, ante.)
The jury was also directed to consider whether the witness failed to select the defendant in an out-of-court identification procedure (item 9) and whether there has been an inconsistent or consistent identification by that witness or another witness to the same event (items 1, 12).

States Supreme Court,[12] a commentator on the subject,[13] and newspaper and other articles reporting where innocent individuals had been misidentified.[14]

Thus, Jackson's defense counsel was able to put before the jury those matters relating to the reliability of eyewitness identification that would have been testified to by the expert witness. The vehicles of cross-examination, argument and instructions relating to the facts of this case, highlighted the psychological factors and unreliability of eyewitness identifications and focused the jury's attention on the issues. These vehicles, particularly cross-examination, could swiftly disabuse the jury of misconceptions it had about the reliability of eyewitness identification. Witnesses admitted on cross-examination of difficulty telling members of another race apart. The arguments made here and specific instructions provided a function similar to an expert's testimony by insuring the various factors (of which a jury might not independently be aware) were brought to the jury's attention and thus a subject of deliberations.[15]

An examination of defense counsel's use of these traditional vehicles reveal any error in excluding the expert's testimony was rendered harmless. Such a conclusion is buttressed by the great weight of evidence of guilt presented as well as Jackson's lack of any defense. It is not reasonably probable a different result would have occurred had the expert witness been allowed to testify.

---

[12]Defense counsel paraphrased the following language from the *United States* v. *Wade* (1967) 388 U. S. 218, 228 [18 L. Ed. 2d 1149, 1158, 87 S. Ct. 1926]: "The vagaries of eyewitness identification are well-known; the annals of criminal law are rife with instance of mistaken identification." (Fn. omitted.)

[13]Defense counsel, quoting from Justice Frankfurter, *The Case of Sacco and Vanzetti: A Critical Analysis for Lawyers and Laymen* (Little Brown & Co. 1927) page 30, stated: " 'What is the worth of identification testimony, even when uncontradicted? The identification of strangers is [proverbially] untrustworthy. The hazard of such testimony is established by a formidable number of instances in the records of English and American trials. These instances are recent.' "

[14]E.g., a commentator cataloguing cases in which defendants had "been erroneously identified by 13, 14, 17 maybe 30 witnesses"; the "notorious English case called the case of Adolph Beck" where "22 persons positively identified an innocent man"; a New York newspaper article about two innocent men who were arrested because the police said they bore a resemblance to a composite drawing of the suspect; a 1973 rape/robbery case where five women independently identified the wrong man.

[15]We do not mean to imply a trial court would be justified in excluding an expert's testimony on eyewitness identification because the traditional vehicles provide an adequate substitution. Rather, we are only saying the traditional vehicles have successfully presented the factors to which the expert would have testified and thereby eliminate the need for a reversal and a new trial.

## V*

. . . . . . . . . . . . . . . . . . . . . . . . .

The judgment is modified to reflect a conviction of assault to commit rape of Hak J. (count 13); the cause is remanded for resentence on that count only and to allow the court to exercise its discretion whether to strike the section 12022.3, subdivision (a), weapon enhancements. In all other respects, the judgment is affirmed.

Brown (Gerald), P. J., and Butler, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied April 18, 1985. Bird, C. J., and Mosk, J., were of the opinion that the petition should be granted.

---

*See footnote 1, *ante*, page 224.