[No. D003062. Fourth Dist., Div. One. Sept. 4, 1986.]

THE PEOPLE, Plaintiff and Respondent, v.
ANTHONY STEVEN WALKER, Defendant and Appellant.

COUNSEL

John M. Schau, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Robert M. Foster and Frederick R. Millar, Jr., Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**WIENER, Acting P. J.**—Anthony Steven Walker appeals from the judgment entered on jury verdicts convicting him on a single count of attempted robbery (count 1) and three separate counts of robbery (counts 2-4). The jury also found Walker used a knife in the commission of each offense. We reject Walker's arguments of trial and sentencing errors and affirm the judgment.

## FACTS

Walker's principal contention centers around the trial court's refusal to admit the expert testimony of Dr. Fay Girsh, a psychologist, concerning factors bearing on the reliability of eyewitness identifications. The legal basis for Walker's argument rests on *People* v. *McDonald* (1984) 37 Cal.3d 351 [208 Cal.Rptr. 236, 690 P.2d 709] in which the California Supreme Court held the error in excluding such proffered testimony might require reversal. Because a trial court's ruling to reject expert testimony on this subject and appellate review of that decision are fact-related, governed by the *McDonald* criteria, the following detailed factual discussion is necessary.

The offenses Walker was charged with committing occurred on September 26, 1984, between the hours of 10 p.m. and midnight. The victims in the crimes were: Judy Slubowski and Marie Nagengast (counts 1 and 2); Dana Webb (count 3); and Mary Ramirez (count 4).

### A.

### *Counts One and Two*

About 10 p.m. Slubowski and Nagengast left a Point Loma restaurant and were standing by their parked cars. Walker approached them with a knife and said, "Give me your purse," or "Give me your purses." Walker

held the knife to Nagengast's side. He said, "Give me your purse, bitch." He then pulled the purse off her right shoulder and ran away. The $20 in Nagengast's purse was missing when the purse was returned to her the following morning. Nagengast was sure Walker was the robber.

Slubowski and Nagengast both identified Walker through a photographic display and again at the preliminary hearing. Slubowski was "positively sure" of her identifications of Walker. Nagengast "very definitely" recognized Walker as being the robber at the time of the earlier identifications. Neither victim was certain of their identification of codefendant Neeley as the man in the get-a-way car described by Nagengast as a big car, olive green in color and "kind of drab."

## B.

### Count Three

About 11 p.m. Webb went to the 24-hour automatic teller at the Bank of America on Balboa Avenue. After withdrawing $20 from the machine, Webb started to return to her car. She heard someone say, "Ma'am." Webb looked up. She saw a young Black man with a knife crouched by the side of her car. The robber, whom Webb positively identified at trial as Walker, told her, "Give it to me." Webb threw her wallet at Walker. Walker then said, "That's not all." Webb realized she still had her bag over her shoulder. She said, "This is all I have." She threw the bag to him. Walker caught the bag, came toward her, put the knife in her face, called her a foul name, turned and ran. Webb ran to the end of the parking lot. She saw the same green car she had noticed earlier while it was parked on the side of the bank. She saw Walker driving the car. Webb was unable to get the license number because the automobile lights were off.

## C.

### Count Four

Between 11 and 11:30 p.m. Ramirez went to the Big Bear Market on Adams near Kensington. As she was leaving the store, a Black man, whom she positively identified as Walker, approached her and said, "Give me your purse." She asked, "What did you say?" Walker responded, "Give it to me or else." Walker brought his knife closer to her throat. Ramirez gave him her purse which contained between $25 and $30. Walker went to a parked car. He got in on the passenger side.

When the police arrived at the store, Ramirez and two other witnesses were taken to a location less than five minutes away for a curbside identi-

fication of two men. Ramirez identified Walker as the robber. The men had her purse. Ramirez' wallet and a small leather change purse which had contained money and some odds and ends were missing.

Ramirez' robbery was witnessed by Mark Youngkin who was in a nearby telephone booth. He saw two men pull into the driveway and look at him in a manner which made him think they were going to rob him. About 20 seconds later he heard a scream, looked up and saw a Black man with a knife taking a woman's purse in the area of the door of the grocery store. The man grabbed the woman's purse after telling her, "Give me your purse, bitch." The man who committed the robbery was the same one who had been in the passenger seat of the vehicle which he had seen previously.

Youngkin went to his truck and followed the get-a-way car into an alley where he waited until the police arrived. Youngkin described the robber as a young Black male, medium build, five feet eight inches tall, with a two-inch afro, wearing a brown shirt with a white stripe and dark pants. The driver had a real short afro and a protruding upper lip. The driver was wearing a purplish sweat suit with two white stripes on the sleeve.

The police accompanied Youngkin to a location where another officer had stopped a vehicle in which there were two men. Youngkin identified Walker as the passenger, "the one who did the actual robbing." He identified the second man as the driver, codefendant Neeley.

Another bystander who witnessed the robbery was Richard Kirkpatrick. He saw a Black man run up to the lady as she was coming out of the store and say, "Give me your purse." Kirkpatrick got the license number of the car as it was pulling away. He repeated the number to himself and then wrote it down before telephoning the police. He described the vehicle as a brown 1968 Pontiac with a vinyl top, lighter than the rest of the car.

Kirkpatrick was also taken to the curbside location to identify the men in custody. He identified Walker as the person who robbed Ramirez. He was unable to identify the other man. The car appeared to be the same car which had been used in the robbery.

### D.

San Diego Police Officer Michael Gulyas, proceeding west on El Cajon Boulevard was driving to the scene of the Ramirez robbery when he heard a radio broadcast of a possible suspect vehicle described as being large with a white vinyl top over brown with a license plate similar to 1 CLZ 245. Gulyas saw a car which looked like the car described in the radio dispatch.

He pursued it. The car turned into an alley. Gulyas could see the license number was 1 CLZ 425. He also could see papers flying out of the passenger side of the car.

Gulyas made a "hot stop" of the car. He waited for other police cars to arrive before ordering Walker and Neeley out of the car. Neeley was the driver; Walker was the front seat passenger.

On the front passenger seat of the car the police found some papers and women's jewelry which Ramirez identified as belonging to her. A large knife was found on the floorboard between the side of the front passenger seat and the door. Ramirez' purse was found in the east alley in the area where the vehicle had been pursued.

Gulyas could smell an odor, possibly alcohol, from Walker. In Gulyas' opinion Walker did not show any objective signs of intoxication. After Gulyas drove Walker to jail, Walker stumbled around, moved his head and his eyelids drooped, causing Gulyas to believe Walker was making an effort to "give the appearance that he was intoxicated."

Youngkin identified Neeley's jacket as that being worn by the get-a-way driver.

Detective Richard Hansen testified the robbery at the Point Loma restaurant was reported to the police at 10:29 p.m.; the Webb robbery at 11:16 p.m.; and the Ramirez robbery at 11:33 p.m. Hansen was able to travel from the restaurant to the scene of the second robbery in less than 15 minutes during medium traffic conditions and driving within the speed limit. He was also able to drive from the scene of the second robbery to the scene of the third robbery in less than 15 minutes.

Walker testified. He admitted robbing Ramirez, but denied committing the other two robberies. Walker admitted he lied to Gulyas and Hansen when he denied robbing Ramirez.

DISCUSSION

I

The trial court excluded Dr. Girsh's testimony on two grounds: (1) there was substantial independent reliability of Walker's identification; and (2) Evidence Code section 352. The court said: "I think all four crimes are tied in together by a rather striking modus operandi. We have a young black man who approaches; basic clothing description is the same. He approaches

a woman. He at least twice uses similar language. He grabs the purse, uses a knife, gets into a car. Just to me, it's striking; and then the fourth count, in which the victim's identification is in the car which he is in, I just think that there's substantial evidence that supports the identity. . . .

"The second thing, under . . . [352], I would exclude; that it's likely to be—substantially a danger to confuse the issues. It will be unduly time-consuming . . . ."

Walker argues the court's reasons are wrong, the exclusion of the evidence was error, and the error requires reversal.

## A.

Before *McDonald* trial courts relying on the then-established rule (e.g., *People* v. *Guzman* (1975) 47 Cal.App.3d 380, 385-386 [121 Cal.Rptr. 69]; *People* v. *Johnson* (1974) 38 Cal.App.3d 1, 6-7 [104 Cal.Rptr. 1]) routinely excluded expert testimony on the factors which could possibly cause mistaken observations "since the variables affecting normal perception are common knowledge and expert testimony tends to invade the province of the jury." (*People* v. *Brown* (1985) 40 Cal.3d 512, 526 [220 Cal.Rptr. 637, 709 P.2d 440].) *McDonald* made clear, however, "that expert 'eyewitness' testimony is not excludable on either of these traditional grounds." (*Ibid.*) ▪ Emphasizing the unreliability of eyewitness identification in the prosecution of criminal cases and the "'high incidence of miscarriage of justice' caused by . . . mistaken identifications" (37 Cal.3d at p. 363 quoting *United States* v. *Wade* (1967) 388 U.S. 218, 228 [18 L.Ed.2d 1149, 1158, 87 S.Ct. 1926]), *McDonald* imposed a duty on trial courts to admit expert testimony on eyewitness identification in every case where "eyewitness identification of the defendant is a key element of the prosecution's case. . . ." (At p. 377.) Under *McDonald* exclusion of such evidence is not permitted unless the identification of the defendant is "substantially corroborated by evidence giving it independent reliability. . . ." (*Ibid.*)

Interestingly, in permitting the trial court to exclude expert eyewitness testimony, *McDonald* does not rely on Evidence Code section 352.[1] This omission is understandable since the scope of trial court discretion under the exception expressed in *McDonald* is essentially the same as that provided for by subdivision (a) of section 352. That statutory provision permits exclusion where the court in its discretion determines the probative value of the proffered evidence "is substantially outweighed by the probability

---

[1]All statutory references are to the Evidence Code. Wherever possible when referring to statutory subparts, we omit repetition of the word "subdivision."

that its admission will (a) necessitate undue consumption of time . . . ."

In effect once the trial court determines the identification of the defendant is "substantially corroborated by evidence giving it independent reliability" under *McDonald*, it has impliedly, if not expressly, determined that admission of such expert testimony will unnecessarily consume valuable court time. Thus section 352(a) is properly applied to exclude proffered expert eyewitness identification testimony where the trial court has determined the identification of the defendant has been substantially corroborated by evidence giving that identification independent reliability.

To conclude, however, as the trial court seems to have done here, that subdivision (b) also can serve as the basis to exclude proffered expert eyewitness testimony is to misread the mandate of *McDonald*. In addition to the "undue consumption of time" rationale, section 352 also allows a court to: ". . . exclude evidence if its probative value is substantially outweighed by the probability that its admission will . . . (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." *McDonald*, however, eliminates trial court discretion to exclude the expert's testimony because it might tend to confuse the issues. *McDonald* states: "Evidence that is relevant to the prime theory of the defense cannot be excluded in wholesale fashion merely because the trial would be simpler without it. Rather, it should be accompanied by instructions clearly explaining to the jury the purpose for which it is introduced . . . [A]ny excess in the quantity or complexity of such testimony can be controlled by the court's power to limit the presentation of evidence." (*McDonald, supra,* 37 Cal.3d at p. 372.)

Thus if the defense expert is qualified to testify, and the key issue is a defendant's identity, the mandate of *McDonald* prevents the trial court from excluding such testimony because the expert's testimony may prejudice the prosecution's case, confuse the issues or mislead the jury. Although the positivism of the eyewitness identification established in the People's case-in-chief is likely to be obfuscated by the defense expert on eyewitness identifications, this is exactly what *McDonald* contemplates. To deny a defendant the right to present evidence which impairs the jury's determination of an issue crucial to the defense because admission of such evidence prejudices the prosecution or confuses the jury on the precise issue which the People must prove, i.e., the identity of the defendant, is tantamount to reducing the prosecution's burden of proving the defendant guilty beyond a reasonable doubt. Accordingly, the factors contained in section 352(b) cannot be used as a substitute for the exception expressed in *McDonald*. In the case before us the trial court's reliance on the *McDonald* exception was the only correct reason to exclude Dr. Girsh's testimony. Whether there is

sufficient evidence to support the trial court's ruling and if not whether the court's error was prejudicial require further discussion.

B.

The trial court concluded that Walker's identity was "substantially corroborated" within the meaning of *McDonald* by using the reasoning authorized by subdivision (b) of section 1101. That section permits the introduction of evidence of other crimes when relevant to prove identity and not the defendant's disposition to commit such acts. (*People* v. *Poon* (1981) 125 Cal.App.3d 55, 70 [178 Cal.Rptr. 375].) Although the reasoning process is similar, quite different considerations are implicated when the reasoning is used to admit evidence—the usual case—as opposed to being used to exclude evidence—the purpose for which it was used here.

■ When the admission of "other crimes" evidence is the issue, the trial court must make a threshold determination that the "other crime" and the charged offense share sufficient similarities to allow the jury to draw the inference that if the defendant committed the "other crime," he probably committed the charged offense. (See *People* v. *Haston* (1968) 69 Cal.2d 233, 245 [70 Cal.Rptr. 419, 444 P.2d 91].) Although the individual shared marks need not be "signatorally distinctive," they must at a minimum yield a distinctive combination which permits the jury to draw the desired inference. (*People* v. *Harvey* (1984) 163 Cal.App.3d 90, 101 [208 Cal.Rptr. 910].)

■ Had the admissibility of "other crimes" evidence been the issue in this case,[2] the trial court would have been required to determine whether the offenses in counts 1 through 3 were circumstantially similar to the Ramirez robbery, which Walker admitted he had committed, such that the jury could infer that Walker committed the crimes which he denied committing. The similarities of the respective offenses include the following: (1) the crimes occurred within a period of less than two hours; (2) all victims were women; (3) the perpetrator was a young Black man wearing essentially the same clothing; (4) the robber threatened each victim with a knife and used similar language; and (5) a vehicle was used as a means of escape. The admissibility issue would present a close question on these facts because several of these alleged "similarities" are nothing more than the similarities inherent in the type of crime committed. We suspect that the "typical" purse snatcher operates similarly as did the purse snatcher in the offenses

---

[2]The admissibility issue was not presented to the court because Walker was charged with all three robberies in the same proceeding. Thus, evidence of each of the offenses was necessarily admissible.

before us. Seen in this light, these "shared marks" are of such common occurrence that they are shared not only by the charged crimes, but also by numerous other similar crimes committed by persons other than the defendant. (*People* v. *Haston, supra,* 69 Cal.2d 233, 245; *People* v. *Harvey, supra,* 163 Cal.App.3d at pp. 101-103.) On the other hand, even these indistinctively common similarities must be viewed in the context of the confined time period (two hours) and relatively confined geographic area (fifteen minutes driving time) within which they occurred.

As we have explained, however, the admissibility of the Ramirez robbery to prove the other charges is not the issue we face here. Rather, we must address the legitimacy of the trial court's conclusion that the inference of identity arising from Walker's admitted commission of the Ramirez robbery is sufficiently strong to constitute the independently reliable identification required by *McDonald* which justifies the *exclusion* of defense expert testimony on the issue of eyewitness identification.

We believe that as a general rule the independently reliable evidence sufficient to satisfy *McDonald's* substantial corroboration requirement must be something other than the inference drawn from defendant's commission of similar "other crimes." Obviously there may be cases in which the manner of committing the crime is so unique—so "signatorally distinctive"—that there can be no question that the unknown perpetrator is identical to the known perpetrator in another offense. (*People* v. *Harvey, supra,* 163 Cal.App.3d at p. 101.) For example here, had the robber attired in pith helmet and catcher's mitt stood on one leg while singing the first stanza of "God Bless America" before threatening the victim and stealing her purse, such evidence would have been sufficient to constitute the substantial corroboration of identification required by *McDonald.* Where the inference is merely suggestive—as it is here—and reasonable persons could still disagree on the defendant's identity, a defendant cannot be denied the opportunity to present evidence on an issue crucial to his defense. Thus a trial court in evaluating whether the evidence of independent reliability meets the minimum required by *McDonald* must be satisfied that there is no possibility that any reasonable jury could be affected by further testimony on factors relating to eyewitness identification. Only where the trial court is convinced that the state of the record is such that the proffered testimony relating to the relevant specific psychological factors affecting eyewitness identification could not raise a reasonable doubt as to identity, may the court exercise its discretion to exclude such testimony. ██ To apply any different standard has the effect of involving the judge in an unarticulated directed verdict of guilty and of denying a defendant the benefit of evidence which could affect the outcome of his case. If there is any reason to believe that the expert's testimony might secure an acquittal for the defendant, the trial court cannot

exclude the defendant's expert witness on eyewitness identification. (See Comment, *Admission of Expert Testimony on Eyewitness Identification*, 73 Cal.L.Rev. 1402, 1426.)

 Based on the foregoing discussion, we conclude that since the "modus operandi" here was not signatorally unique, the court erred in excluding Dr. Girsh's testimony.

## C.

The question remains whether the court's error requires reversal under *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243]. *McDonald* was a much more closely balanced case than the one before us. There, McDonald allegedly shot the victim on the corner of a busy intersection during rush hour in which the entire event lasted only a few minutes. Of the eight testifying eyewitnesses, four made positive in-court identifications, three made tentative identifications and one was positive McDonald was not the perpetrator. Moreover, McDonald had an alibi defense corroborated by the physical evidence and six witnesses who testified he was out of the state. The *McDonald* court decided that the error in excluding expert testimony was prejudicial "given the potential weaknesses in the prosecution's testimony and the presence of both eyewitness and alibi testimony favorable to the defense." (*People* v. *McDonald, supra*, 37 Cal.3d at p. 376.) The court also noticed the closeness of the case was reflected by the length of the deliberations which took three and one-half times longer than it took to put on the entire prosecution and defense case. (*Id.*, at p. 376, fn. 23.)

The case before us is not nearly as close as the one in *McDonald*. Sensitive as we are to *McDonald's* admonition that "[a]n error that impairs the jury's determination of an issue that is both critical and closely balanced will rarely be harmless" (*Id.*, at p. 376) we nonetheless are satisfied here that absent the error, it is not reasonably probable the jury would have reached a different result.

In addition to the positive photographic identification by Slubowski and Nagengast and the certainty of identifications of each of the witnesses, Walker's mushy denial at trial of these offenses gave the jury little to debate in their deliberations. At the conclusion of this six-day trial the jury took about a day to render their verdicts on both Walker and Neeley. Although the brevity of their deliberations is arguably only a product of the certainty of the eyewitness identifications, it also is reflective of the closeness of the case. The jury's concern with reaching a fair result is reflected in their decision acquitting Neeley of participating in the robbery of Ramirez. In addition to the lack of a meaningful defense theory on the first three counts

and the unequivocal eyewitness identifications, there is other corroborating evidence.

The money found in the possession of the defendants—about $58—approximates the money taken from all the victims. Further, a package of Benson and Hedges Ultra Light cigarettes similar to the cigarettes taken from Nagengast were found in Walker's right front pants' pocket at the time of his arrest. In his left front pocket there was a package of Camel cigarettes. Walker attempted to explain his well-stocked cigarette supply by first saying he didn't know until he was arrested that he had those cigarettes in his pocket and they "might have come to be in [his] pocket" because "I guess I went—I guess I went to my mother's car the other day—the day before that, and she had a pack in here, and got it out of there." Walker's inept explanation in response to his defense counsel's leading questions on this point justified the jury's rejection of him as a credible witness.

Walker's defense was diligently and ably presented by defense counsel. Defense counsel's closing argument consisted of a careful review of the facts including the weakness of the eyewitness identification focusing on the psychological factors and unreliability of eyewitness identifications as they applied to Walker. (See *People* v. *Jackson* (1985) 164 Cal.App.3d 224, 245 [210 Cal.Rptr. 680].) After our review of all aspects of this case we conclude the court's evidentiary ruling in excluding Dr. Girsh's testimony was harmless.

## II

Walker also contends the court prejudicially erred in refusing his cross-racial identification jury instruction. Walker asked the court to give the following: "In evaluating the testimony of witnesses on the issue of identification you may consider whether or not the witness is of the same race as the individual he is attempting to identify. If the witness is not, you should consider the effect this would have on an accurate identification."

The court modified CALJIC No. 2.91 relating to the jury's consideration of eyewitness identifications, to include "any difference in racial characteristics between the witness and the person the witness is identifying." Because the subject was covered by a correctly modified instruction, the court did not err in refusing Walker's instruction.

## III

Walker also argues the court erred by giving the standard jury instruction on flight. (CALJIC No. 2.52 (1979 rev.).) CALJIC No. 2.52 provides: "The

flight of a person immediately after the commission of a crime, or after he is accused of a crime, is not sufficient in itself to establish his guilt, but is a fact which, if proved, may be considered by you in light of all other proved facts in deciding the question of his guilt or innocence. The weight to which such circumstance is entitled is a matter for the jury to determine."

In directing his arguments to counts one through three, Walker tacitly concedes the instruction was proper in reference to the Ramirez robbery. Thus his argument is not that the court erred in giving the instruction but that it should have on its own motion limited the instruction to count four. We are unwilling to impose upon the trial court a further sua sponte burden to limit a correct instruction on flight to specific counts. We are also satisfied that even if the court erred by failing to so limit the instruction here, the error was harmless.

## IV

Because the attempted robbery of Slubowski and the robbery of Nagengast arose out of the same incident, Walker claims concurrent sentences on those counts is precluded by Penal Code section 654. Although Walker correctly states the general rule, he may still be punished for each such crime because each of the crimes involve violence against a different victim. (*People* v. *Ramos* (1982) 30 Cal.3d 553, 583-587 [180 Cal.Rptr. 266, 639 P.2d 908].) The attempted robbery of Slubowski involved a different act of violence than the robbery of Nagengast. The court properly imposed separate punishment on each conviction.

### DISPOSITION

Judgment affirmed.

Work, J., and Butler, J., concurred.